RICHARD LUKE v. THE WHEAT MINING COMPANY.

*Contributory negligence—Submission of question to jury.*

1. Where the question of contributory negligence is in doubt under the evidence, it is the duty of the court to submit it to the jury.

2. In this case it is held that such doubt existed, and the judgment is affirmed.

Error to Marquette. (Grant, J.) Argued June 29, 1888. Decided July 11, 1888.

Negligence case. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Hayden & Young,* for appellant.

*E. E. Osborn,* for plaintiff.

CHAMPLIN, J. On October 31, 1885, the plaintiff met

with an accident while in the employment of defendant, which caused the loss of a leg.

Defendant operated a small open pit-mine, which, at the time of the injury, was only about 20 feet deep below the surface at the deepest place. Ore was raised to the surface by means of a " skip road ;" being a track laid from the bottom of the mine up the inclined side to the surface, a distance of about 70 feet, and thence continued up a trestle-work, at a less grade, to the dumping ground, a distance of about 90 feet from the surface of the mine. Upon this track a " skip car " was · used in taking out the ore. This was worked by an engine and drum. A rope led from the drum around a pulley at the end of the trestle, and was attached to the " skip," which was by this means hauled from the pit loaded with ore, and dumped, and then allowed to descend again by its own gravity ; its speed being regulated by a brake in the engine-house under the control of the engineer.

The grade from the bottom of the pit to the surface was represented by an. angle of 16 or 17 deg. from a horizontal plane. When near· the surface, the " skip track " passed through a cut in the rock for several feet, just wide enough for the " skip " to pass, and too narrow for a person to pass with safety between the " skip " and the walls of the cut. This point was about 50 feet from the pump-house, near the bottom of the mine. The pump is worked by steam carried to it from the engine-house, and is used for pumping the water out of the pit.

It had been the custom to use this skip track for the men employed at the mine in going to and from their work. Although there were two or three other passages by which the men could descend into the pit, yet they were more difficult, and seldom used. The movements of the skip car were controlled by the engineer in the engine-

house under signals from the men in the pit.    These signals were given by a bell in the engine-house, from which a wire led to the bottom of the pit; one bell to stop, two bells to lower, three bells to hoist for ore, four bells for rock.    The usual practice was to keep the skip over night at a certain place called the "skip station," which was near the foot of the trestle, and from 10 to 15 feet from the surface.    It could be seen at this point from the bottom of the pit.

On the morning of the day stated, the plaintiff, whose place of work was upon the surface, finding the water frozen in his bucket, went to the pump-house at the bottom of the mine to thaw out the ice with steam. Arriving there, he found Capt. Prout, who was the boss of the workmen in the mine.    It was after 7 o'clock, and time for the men to commence their day's labor.    The plaintiff and the captain had some conversation at the pump-house while plaintiff was thawing the ice.    The plaintiff testified that Capt. Prout said : "Look sharp, Uncle Dick, it is time for you to get out ; it is half-past seven ;" that he replied : "Give me time ;" and the captain said : "You may have good time."    Capt. Prout testified that he was in the pump-house when the whistle blew for 7 that morning, and a few minutes after 7, the plaintiff came to the pump-house to have the ice thawed out of his bucket ; that the steam was applied by a hose, and he applied the steam, and thawed out the bucket, and then said : "Now, Dick, get out of the way, and let Carey come in."    Carey was Dick's partner.    Luke might have said : "Give me time to get out of the way."    Capt. Prout testified that he had no reference to Luke's getting out of the mine, or out of the way of the "skip," but out of the way of Mr. Carey, who had a tool called the "gun," which is part of a drill, that he wanted to thaw out.

The court adopted Capt. Prout's version in his charge to the jury.

After the ice was thawed from the bucket, Luke started to go up the skip track to his work at the surface; and, when in the narrowest place near the surface, the skip descended upon him without timely warning, ran upon him, and broke his leg, and so crushed it that amputation was necessary. The plaintiff claims that Capt. Prout gave orders to the engineer to lower the skip by an oral order to that effect while in the engine-house; that it was not lowered in accordance with the ordinary signal given by the men in the mine, when they could see the track was clear, or give timely warning to those upon the track.

The engineer testifies that Capt. Prout came into the engine-house about half past 7, and ordered him to lower the skip into the mine, as it was already late; that he was engaged, at the time, in "firing," and, as soon as he had finished, he lowered the skip without any signal from the mine, and in obedience to the captain's orders.

The captain was sworn on the part of the defendant, and flatly contradicted giving any order for the lowering of the skip. The question of defendant's negligence was made to turn upon the veracity and credit which the jury should give to these two witnesses.

The court charged the jury, if the signal to lower the skip was given by the skip tender or laborers at the bottom of the mine, the injury received would be the result of the negligence of a fellow-servant, and the plaintiff could not recover. The defendant also contended that the plaintiff was guilty of contributory negligence; that he knew that the path he was traveling was a dangerous one, and knew that the skip was above the surface, and was liable to descend at any moment, and he ought to have expected it, and been on the alert to avoid the danger

which constantly threatened any one in passing along the skip track after the commencement of working hours; that, by plaintiff's own testimony, he was looking down upon the ground to see where to step, and did not see the skip until it was within eight feet of him, when it had moved thirty-eight feet from where it started.

The defendant's counsel submitted special questions to the jury, which were answered by them as follows:

"1. Did Mr. Prout instruct the engineer, Smith, to lower the skip in the manner testified to by Smith?

"A. Yes.

"2. At what time was the skip lowered?

"A. About half past seven A. M.

"3. Would Luke have been struck by the skip if he had been looking up, and taking such care as he ought to have taken under the circumstances?

"A. Yes.

"4. Did some one of the men at the bottom near the skip pit pull the bell wire, and give the signal for the skip?

"A. No."

The jury returned a general verdict for the plaintiff.

Counsel for defendant insist that the plaintiff was guilty of contributory negligence, and the court should have instructed the jury that for this reason he was not entitled to recover. We regard the question a very close one upon this record. The circuit judge evidently so regarded it. But where there is any doubt, under the evidence, it is the duty of the court to submit it to the jury. Counsel for defendant seems to have considered that there was evidence to go to the jury on the question of plaintiff's care; for, notwithstanding he requested the court to instruct the jury that the plaintiff could not recover because the plaintiff was guilty of contributory negligence, he submitted a request to the jury to find as a fact whether he would have been struck by the skip if

he had been looking up, and taking such care as he ought to have taken under the circumstances.

We think there was testimony that made it proper for the court to submit the question whether or not the plaintiff was guilty of contributory negligence to the jury. Luke was nearly 60 years old, and had worked at mining since he was 14 years of age. He must therefore have been well acquainted with the methods and customs in which mines were worked. He testified that, on account of the frost on the morning of the accident, the track where he walked was slippery, and his mind was upon where he stepped; that it had been customary, when any one was upon the track when the skip car was about to be lowered, for the skip tender to sing out, and warn persons to look out for the skip car. But on this occasion the skip car was lowered without warning by the engineer, as was found by the jury, in obedience to the order of the mining captain; and we cannot say, in view of all the facts and circumstances, that the plaintiff himself was not in the exercise of ordinary care. It is a question, at least, upon which different minds might very well arrive at different conclusions from the testimony; and in such case the question must be submitted to the jury.

The charge of the court was very careful and very fair, and was as favorable to the defendant as it was entitled to. It would not have been error if the judge had left it as a fact for the jury to find whether, from the conversation testified to by plaintiff between himself and Captain Prout, the plaintiff was assured that time should be given him to reach the surface in safety, and before the car should be lowered; but the judge took the other view, and construed the expression as applying to the plaintiff's getting out of the way of others who wished to

71 MICH. 24.

reach the pump-house, and were waiting to have the ice thawed from their working tools.

We perceive no error of law in the record, and the judgment is affirmed.

The other Justices concurred.