JOHN Q. ADAMS AND DWIGHT L. WEST, ADMINISTRATORS, ETC., v. THE IRON CLIFFS COMPANY.

*Negligence—Directing verdict—Presumption against contributory negligence—Public highways—User—Estoppel—Fellow-servants.*

1. Where in a negligence suit there is no eye-witness to the accident it will be presumed, in the absence of any evidence to the contrary, that the deceased used ordinary care and caution, which presumption is sufficient to permit the plaintiff to recover upon showing negligence on the part of the defendant. *McWilliams v. Mills Co.*, 31 Mich. 274; *Mynning v. Railroad Co.*, 59 Id. 257, 64 Id. 102, 67 Id. 680; *Kwiotkowski v. Railway Co.*, 70 Id. 549.

2. Where in a negligence case there is a chance upon the facts shown for ordinarily candid and intelligent men to arrive at different conclusions, the question of contributory negligence is to be determined by the jury.

3. Public user alone, when sufficiently general and long continued, will constitute an acceptance of a country road.

4. Where a corporation has for over 20 years maintained a road across its property, which has been used by the public as a connecting link in a road between two towns, and has laid railroad tracks across said road upon its property, and permitted the public to use the crossing, which it has planked, without any dissent, it is estopped from denying that, so far as said crossing is concerned, it bore the same relation and duty to travelers upon it as if it were in fact a public highway, and is bound to use due care and diligence in running its trains over said crossing to prevent injury to passengers lawfully on the road.

5. Where a servant, whose duty it is at any time during working hours when upon the master's premises to perform the duties incident to his employment, starts to leave the premises on his private business, and is injured by the alleged negligence of the master, while upon the premises, and during working hours, he is at the time in the employment of the master.

6. A founder in a blast furnace for the manufacture of pig-iron, who has a separate department,—the inside work of the furnace,—and who has nothing to do with the other departments, except when acting through the general management or the foreman or boss of such departments, is held to be a fellow-servant of an engineer whose business it is to move the cars on the furnace track as desired in the business, and to assume the risk that said cars might be handled negligently by said engineer.

Error to Marquette. (Grant, J.) Argued October 17 and 18, 1889. Decided December 28, 1889.

Case. Plaintiffs bring error. Affirmed. The facts are stated in the opinion.

*Hayden & Young,* for appellants.

*W. P. Healy* (*Arch. B. Eldredge,* of counsel), for defendant.

[The positions of counsel are stated and discussed, with citation of authorities, in the opinion.—REPORTER.]

MORSE, J. This action is brought for the death of James A. Root, on March 8, 1886, by the alleged

negligence of defendant. The court directed a verdict for the defendant upon several grounds:

1. The declaration alleged that the accident occurred on a public highway, and that the deceased was therefore entitled to all the rights and privileges of a traveler on a public highway. The court found that there was no testimony tending to show that the road in question was a public highway of sufficient force to be submitted to the jury, and held that this was the private road of the defendant, and that the public had acquired no rights in it by user or otherwise.

2. The court found that the plaintiffs' intestate must have been guilty of contributory negligence.

3. That none of the allegations in the declaration of plaintiffs as to defendant's negligence had any foundation in fact, except the averment that the engineer was negligent in starting his train without warning, and that, as to this negligence of the engineer, such engineer was a fellow-servant of the deceased, and there being nothing in the case to show that defendant did not use due diligence in the employment of competent men, and no evidence that the engineer or brakeman was not competent, the plaintiffs could not recover for any negligence on the part of said engineer.

In order to fully understand the bearing and correctness of these rulings it will be necessary to state some of the surroundings and circumstances of the accident, or killing of Mr. Root, as shown upon the trial by the plaintiffs.

The defendant corporation owns and operates a blast furnace at Negaunee, on the line of the Chicago & Northwestern Railway. This furnace manufactures charcoal pig-iron. This requires room for cord-wood, charcoal, flux, and iron ore, as well as a yard in which to store the pig-iron. The furnace consists of two stacks, and a tract of land called the "furnace bank" is occupied in carrying on the business. This location is unfenced.

From the main line of the Northwestern Railway, there ran up to the furnace, at quite a steep grade, two

78 MICH.—18.

parallel tracks, and these two tracks connected with other tracks that ran directly into the furnace. These tracks were built by the defendant, but belonged to the railway company, and were used by both the defendant and said company as occasion required, but principally by the defendant. Across these two parallel tracks, called "furnace tracks," there ran three different roads or wagon tracks, all of which connected with a single road or highway leading from the city of Negaunee to Palmer, a village built up in consequence of the Palmer mine and other mines near it. The lower road across the furnace track, and the one nearest the Northwestern Railway, was the road principally used in going from Negaunee to Palmer, or "Cascade," as that village was sometimes called, and was known as the "Cascade Road," and was the road used as a mail route between the two places.

Upon the morning of the day of Mr. Root's death, and about 10 o'clock, defendant's engineer, John Beck, with one brakeman, John Wannamaki, had started from the furnace bank with an engine, backing from five to seven empty box-cars slowly down the grade towards the main line of the Northwestern Railway. As these cars reached the crossing, the brakeman, who was on top of them, saw some cars loaded with pig-iron, which were standing on the other furnace track, get away from the control of the persons in charge of them, and start down the grade. He immediately set two brakes on what he called the front car, the one furtherest from the engine, of his train, and ran down to help stop the cars on the other track. The cars on the first track were stopped over the crossing nearest the railway, and called by the plaintiffs the "Cascade Road." He testifies that half of the forward car was over the crossing. The next crossing was also blocked by cars, but the upper crossing was open. This was seldom used, however. The testimony is not very definite

as to how long these cars remained upon the crossing, the time being somewhere between 5 and 15 minutes.

It is not shown how Mr. Root got under the cars, as no one was present when it happened. The last seen of him was a few minutes before, when he was going along the lower road or highway towards the city of Negaunee. When the brakeman stopped his cars, and before going to the help of the others, he ran back, and told Beck, the engineer, to stop there until he got back. He then ran down to the runaway cars. He jumped on top of them, and set the brakes and stopped them. After they were stopped, he started to go back to his own cars. He did not signal the engineer to start. While going back he heard a yell, and saw the section-boss, Callaghan, running towards the brakeman's cars, which were moving down the grade. There was no bell on the engine of this train, but it was provided with a whistle, which plaintiffs claim was not blown before the starting. Mr. Root was found caught by his right hip under the brake beams of the rear wheels of the foremost car, as they were backing. He was lying on his back, with his face turned upward, and his head and body were outside the track. He was dragged in this way down the track, until his body struck the guard-rail of the frog. The train was then stopped, and Mr. Root taken out. He died almost instantly after being released. How deceased was caught, and when, cannot be definitely ascertained, as when first seen the cars were moving, with his body caught and held under the cars as above stated. There were some blood spots on the snow along-side the rail, beginning at a place a dozen feet or so from the traveled part of the road, over the crossing; and the marks of his body dragging from this point were seen down to the frog, about 300 feet from the crossing. Along the south side of this furnace track, and on the side where Mr. Root evidently attempted

to cross, was a bank of snow about two feet high, and
between this bank of snow and the cars there was not
room enough for a man to walk. It was the theory of
the plaintiffs upon the trial that Root, seeing the train
remain so long, had undertaken to go around the car,
probably supporting himself by placing his hands upon
the side of the car while he walked on the bank of snow
along-side, and the sudden starting of the cars had thrown
him down and under the wheels.

The court charged the jury as follows:

"Now what evidence have you as to the manner of
killing? We find the cars across the crossing. We find
Mr. Root either under the rear car wheels of the first or
the second car. The height of the cars above the track
was somewhere from two to two and a half feet. The
track was of the usual width, we assume,—in the neigh-
borhood of four or five feet wide. The deceased would
have to go some way down the track in order to get
across. Now it is clear that there are three ways in
which the deceased might have got under those cars.
He might have attempted to have gone under there,
under the assumption that the cars would stand there
until he had time; he might have undertaken to have
gone around, and the cars started, and he thrown down
and thrown under; or he might have reached the end of
the car, and been knocked down and run over when he
reached the end. In either case, gentlemen, what was
his duty? The plaintiffs claim that they would go to
you, as I understand it, upon the theory that the
deceased had gone around the car. Assume that to be
the case, then you have heard the testimony in regard to
the speed with which this train went down. I take it
that in that case,—that train and engine attached stand-
ing upon the track,—it is notice to every one that that
train may start at any time. It is in law, in my judg-
ment, clearly contributory negligence for persons to go
along by the side of that car, where, if it moves, they
are in danger of being thrown under, or to go around
the end of the car, and be so near that when the train
started, as it did here, they may be knocked down and
caught under the cars. I take it, gentlemen, it is the
law, a man may not go so near a train of cars as that,

going around, under circumstances of this case, and still have a jury say that they will infer that he was in the exercise of due care and caution. It seems to me clear that it cannot be the law. If he attempted to get underneath the cars, and go across, then that was clearly contributory negligence. So I must charge you, gentlemen, that the plaintiffs in this case have failed to show you evidence from which you would have the right to infer that the deceased was in the exercise of proper care and caution. It would not do to leave juries to guess; there must be evidence from which they may find the substantial facts to entitle a party to recover."

This brings up squarely the question of contributory negligence in a case where there is no eye-witness of the accident. In such a case, while the rule is not relaxed that the plaintiff must show that his intestate was without fault, yet the presumption, in the absence of any evidence to the contrary, obtains that the deceased used ordinary care and caution in attempting the crossing, and such presumption is sufficient under the rule to permit the plaintiff to recover upon showing negligence in the defendant. *McWilliams v. Mills Co.*, 31 Mich. 274; *Mynning v. Railroad Co.*, 59 Id. 257 (26 N. W. Rep. 514), 64 Id. 102 (31 N. W. Rep. 147), and 67 Id. 680 (35 N. W. Rep. 811); *Kwiotkowski v. Railway Co.*, 70 Id. 549 (38 N. W. Rep. 463); *Railway Co. v. Clark*, 108 Ill. 113; *Teipel v. Hilsendegen*, 44 Mich. 462 (7 N. W. Rep. 82).

The court was of the opinion that the deceased might or must have been caught in one of three ways, and that it would not do for the jury to guess as to the facts of the case. But one of these three ways by which the plaintiffs' intestate might have got under the cars, to wit, undertaking to go round the cars by walking on this bank of snow, and slipping therefrom under the cars, was, in the theory of the plaintiffs, the manner in which he did slip or fall under them, and the plaintiffs had the right, under the testimony, to go to the jury upon this

theory, provided such an attempt to go round the cars was not contributory negligence on the part of the deceased. If there was, under the facts shown, a chance for different conclusions to be drawn by ordinarily candid and intelligent men, it was a question to be determined by the jury and not by the court. *Alexander v. Big Rapids,* 70 Mich. 226 (38 N. W. Rep. 228); *Crosby v. Railway Co.,* 58 Id. 463 (25 N. W. Rep. 463); *Teipel v. Hilsendegen,* 44 Id. 462; *Luke v. Mining Co.,* 71 Id. 364 (39 N. W. Rep. 11). And it seems plain from the testimony of plaintiffs' witnesses, which alone must be relied upon for the solution of this question, as the whole case was taken from the jury, that this was the way the accident happened. The deceased could not have been at the end of the car, and there knocked down and run over, as it was clear from all the testimony that no wheel had passed over him, as he was found caught under the brake-beams of one of the rear wheels. Nor is it at all probable that he was attempting to crawl under the cars. The position in which he was found would indicate to most minds that he had slipped and fell upon his back under the cars, and got caught in that position, and in the position in which he was first discovered, and remained until he was pulled out. Was it contributory negligence in the deceased, attempting to walk along the side of the cars upon the ridge or bank of snow? I think the question was one eminently proper to be submitted to a jury, and one which a court has no right to decide.

It appears from the testimony that Mr. Root was a man between the age of 59 and 60 years, and well acquainted with the location and its surroundings, and with the business of the defendant, and its method of conducting such business. He was founder in the blast furnace, and a skilled man in the business. He knew that the train of

cars before him were managed by a brakeman and engineer, without the aid of any other persons. The cars were on a steep down grade, upon which they would not ordinarily, and could not with safety, be backed downward without the presence and work of the brakeman. Mr. Root had started to go down town with the evident intention of attending to some private business of his own. When last seen by Fuller there were at that time no cars upon this crossing of the main road, leading to the city of Negaunee. It is quite probable that Root saw these cars stopped upon the track before he reached it, and the brakeman leave them to go after the runaway cars. If such was the case, was it negligence for Root, as a prudent man, to undertake to walk around them, a distance of about a half a car or more, upon this snowbank? Would an ordinarily prudent man have done so? I have my own opinion, which it is not necessary here to express, but I am satisfied from what has already transpired in the case that ordinarily intelligent, careful, unbiased men might differ in their answers to this question, and therefore it should have been submitted to the jury. It is claimed that between 200 and 300 feet away there was a clear crossing which Root should have taken, but the query again arises, what would an ordinarily prudent man have done under the circumstances, knowing that the cars were set with brakes and stopped, and the brakeman gone to look after the other cars,— would he have tried to go a few feet around the cars, or would he have gone 200 or more feet out of his way and back again, to find a clear crossing? This was for a jury to determine.

Unless the mere act of walking upon this snow-bank was negligence, because he was liable to slip thereon, if not careful, I do not think it could be considered negligence in Root's attempting to pass around the car that

blocked the crossing. If there had been no snow-bank there, but level ground, no one would claim that the attempt to walk around the car was in itself negligence; and whether or not the walking on top of this bank of snow was negligence was, under the testimony of the condition of such snow-bank, a question for the jury. It cannot be considered that he was bound to know, as claimed by defendant's counsel, that this train, without any brakeman upon it, and without any warning, was liable to move at any moment. How often in cities, where a number of tracks cross the street, do men and women pass around the end of stationary trains, when perhaps if they should happen to trip, and fall across the track, and the train start suddenly, without previous warning, they might be caught under it. In such a case, if the railroad employés were negligent, would it be said, as a matter of law, that the contributory negligence of the person injured must preclude recovery? I think not, and that the facts and circumstances would properly be submitted to a jury for them to determine whether or not there was negligence in such an attempted crossing.

The next subject of inquiry is the negligence of the defendant, and in this connection it will be proper to notice the testimony on the part of the plaintiffs as to this road, the crossing of which was blocked by this car. The circuit judge was satisfied that there was no evidence to go to the jury to show it to be any other than a private road of defendant's, upon which it owed no duty to the public or to travelers. The declaration of plaintiffs avers it to be a "public traveled highway;" that Root was lawfully traveling upon such highway, and attempted, as he had a right to do, to cross the furnace track at the highway crossing;—

"That while he was so attempting to pass along said highway, across said track at said crossing, without fault

on his part, said cars and locomotive, without the ringing of a bell or any other warning from said locomotive whatever, and in the absence therefrom of brakemen, and while apparently abandoned, and without any warning from any brakeman thereon, and in the absence of any flagman or watchman at said crossing, as aforesaid, and without any warning of any kind whatever to plaintiffs' intestate, suddenly started with said cars backwards across said crossing, the engine being at the rear of the train as it moved, and thereupon, by means of the neglect and misconduct of the defendant, as aforesaid, and without his fault, said James A. Root was thrown down and under said cars, run over, and pushed and dragged along, under said moving cars, a long distance, to wit, ten rods, and thereby so badly injured that he died within, to wit, two hours thereafter."

There was testimony on behalf of plaintiffs that this road had existed since 1863; that there is no other means of going, and no other roads, between Palmer and Negaunee. A creek called "Partridge Creek" is the south boundary line of the defendant's property. The highway crosses a bridge over this creek, which bridge was repaired at different times by the city of Negaunee. The village of Palmer in 1886 had 800 inhabitants. The mail between the two places has been carried over this road since 1872. The road did not run exactly where it does now, across the defendant's premises, until 1881. In that year these furnace tracks were laid down, and the company made two crossings,—the one where Root was killed, and one above. Since that time the travel has gone over the road where the accident took place, except in cases of heavy loads, when they use the next crossing above. One witness, Mr. Kirkpatrick, testified that there was another little narrow road running from Negaunee to Palmer, but it was a roundabout way and used only for women to drive to the city who were in fear of the locomotive scaring horses on the road across the furnace premises. It was shown by this witness, on cross-examina-

tion by Mr. Healy, of counsel for defendant, that it was customary in the Upper Peninsula for the public to use the private roads of mining locations without asking the consent of the owners. It was not shown that the public authorities of Negaunee had ever done any work upon this road within the limits of defendant's location, but testimony was offered and introduced tending to show work upon the road by the city authorities up to the line of such location, but this was afterwards excluded by the court.

I think it was competent to show that this road across the company's premises was a connecting link between a public road from Palmer to Negaunee, and that the testimony offered was proper for that purpose. No road was ever legally laid out between Palmer and Negaunee, but the plaintiffs claimed it was a road by user. This road was used by the public before these furnace tracks were constructed, and when they were laid down the defendant made a substantial crossing for this road, planking it between the rails of its track. The furnace bank was there in 1863, when this road was first used from Palmer to Negaunee, and such road passed over defendant's premises until 1881. When these tracks were laid in that year, the defendant, for its own convenience, in making a crossing changed the line of the road somewhat, but this does not change the situation.

There was competent testimony offered to show that the public had accepted the dedication of this highway by working upon it between Palmer and Negaunee up to the line of defendant's property on each side, and had repaired and maintained a bridge, half of which stood on defendant's premises. There is no doubt but it was a public road by user of more than 20 years, except upon the defendant's premises, and that the road upon its property was used for the same length of time as a con-

necting link between the two ends of this road by its full consent. It was not necessary that it should be laid out, or attempted to be laid out, by the highway authorities. It could become a public highway by user alone. *Bumpus v. Miller*, 4 Mich. 159; *Detroit v. Railroad Co.*, Id. 209; *Baker v. Johnston*, 21 Id. 319; *Wicks v. Ross*, 37 Id. 464; *Peninsula Iron, etc., Co. v. Crystal Falls*, 60 Id. 523 (27 N. W. Rep. 666); *Kruger v. Le Blanc*, 70 Id. 76 (37 N. W. Rep. 880).

This was a country road, and as such could be accepted by the public by user alone. It was not necessary to show that there had been a formal acceptance by the highway authorities. Public user alone, when sufficiently general and long continued, will constitute an acceptance. See *Detroit v. Railroad Co.*, 23 Mich. 209, citing *Green v. Canaan*, 29 Conn. 157; see, also, *Baker v. Johnston*, 21 Mich., at page 344, per CAMPBELL, C. J.

Under the circumstances as shown by the plaintiffs, they were entitled to go to the jury on the proposition that the defendant, by keeping up this connecting link, and permitting it to be used generally by the public for a period of over 20 years, had thereby dedicated its use as such a link to the public; and also, that at any event, as long as it permitted the public to use this crossing without any dissent, the defendant was estopped from denying that, as far as such crossing was concerned, it bore the same relation and duty to travelers upon it as if it were in fact a public highway, and was bound to use due care and diligence in running its trains over this crossing to prevent injury to passengers lawfully on this road. *Barry v. Railroad Co.*, 92 N. Y. 289.

It is not a sound proposition, either in morals or the law, that the defendant, permitting the public to use a road across its premises for so many years, planking the crossings of its furnace tracks for the accommodation of

such public use, and allowing such road to be connected at one end by a bridge, partly upon its property, with the public highway leading to Palmer, and at the other end with the public road to Negaunee, forming, by so doing, with these connections the only road for public travel between these two places, can yet be authorized to treat every one, except its own employés, as trespassers while using this crossing. But this is the logical outcome of the claim made by defendant's counsel in this case; and such counsel contend that if, at the moment Root was injured, he was not in the employ of the defendant, he was nothing more nor less than a trespasser.

If the view that I have taken of this crossing be correct, then the engineer was negligent if he started the cars without any warning. This engineer, who was sworn for the defendant, testified that the brakeman signaled him to back the cars, which the brakeman denies. He also testifies that he blew the whistle three times before he started to back down. The testimony of the plaintiffs tended to show that no whistle was blown. Whether it was blown or not was a question for the jury.

The circuit judge ruled that the engineer was a fellow-servant of the deceased. If so, then the direction of the verdict in favor of the defendant was right.

It is claimed by plaintiffs' counsel that Mr. Root was not in the employ of the company at the time he was injured. Conceding that the deceased had started to go down town to attend to some private business of his own, which he was in the habit of doing every day, or nearly every day, still, when this accident occurred, he must be considered to have been in the employ of the defendant. There was no stated time in which he was authorized by his employment to leave the service of the defendant and go down town, and attend to his own business. It would

appear that his duties at the furnace were not so exacting but that he could go about his private business at times without detriment to the defendant, and there is no doubt but he was permitted to do so. But his employment by the defendant was such that he was not authorized to subordinate its business to his own, and at any time during working hours when he was on defendant's premises his duty was to look after and perform his duties there. His duties were multifarious, and if, at any time, after he had started to go down town, and while on defendant's premises, any need of his services had arisen, it would have been his duty, under his employment, to have at once stopped and given such services. He was not permitted at any time to say in his own mind, "I will now leave the employment of the company at once, and go about my own business," regardless of what might occur on the premises before he left them requiring his care and attention under his employment. He was not out of the employment of the defendant until he was off its premises. *Broderick v. Depot Co.*, 56 Mich. 261, 268 (22 N. W. Rep. 802). While he was at the furnace location, he had the care and management of a portion of defendant's property, which would call for his attention and oversight. See, also, *Ewald v. Railway Co.*, 70 Wis. 420 (36 N. W. Rep. 12). If this accident had occurred after Root's day's work was ended, the authorities cited by plaintiffs' counsel would apply; but they do not touch the case at bar. See *Baird v. Pettit*, 70 Penn. St. 477, 483, and Taylor, J. (dissenting opinion), in *Ewald v. Railway Co.*, 70 Wis. 433 (36 N. W. Rep. 593), and cases there cited.

The only remaining question is, did the circuit judge err in holding, as a matter of law, that Root was a fellow-servant of the engineer? The business of the engi-

neer, by his own testimony, was to move the cars on the furnace track as desired in the business.

" *Q.* Who gave you orders? Who was in control of you?

" *A.* When I first took the position, sometimes Mr. Corbett and sometimes Mr. Root. If the master mechanic had anything to do,—wanted a car shoved, or machinery, —he would come and tell me what to do. After I got into the way of the business, I knew what to do, without there was any extra work to do. If there was anything extra to do, who wanted it done would come and ask me to do it."

Mr. Thompson was the master mechanic, and foreman generally over the machinery. Alexander Maitland was the general manager of the whole business. He testified on behalf of the defendant that Root, as founder, had charge of the furnace.

" Every man around working the furnace was subject to Root's orders. He had the right to order the master mechanic, from the fact that if the machinery was out of order, or any pipes broken, he had the right to authorize that man to repair those, or he couldn't run his furnace. He had the right to go to the blacksmith shop, and tell him to make what was necessary for him for the proper use of the furnace. He had the right to go to the carpenter, and do the same thing. He had the right to go to Mr. Corbett, who had charge of all the laborers, and tell him to do whatever was required to be done for the successful running of the furnace. In fact, as founder, he ought to have those rights, or he couldn't get along. I couldn't be there to direct, and some one must have authority around the furnace, and the founder is supposed to be the man that knows all about the operations,—what is wanted to be done to run the furnace, and to be successful. To curtail his authority would be to hamper him, and make the plant unprofitable. In regard to carrying out pig-iron, and where it should be piled, and who was to pile it, that was decidedly his business, because he was responsible for the proper grading of the iron, and proper piling of it; and I have always, in any matters regarding piling the iron, I always consulted and talked with Mr. Root about it. He didn't take direct

charge of the handling of the locomotive, from the fact that it was not necessary at all times, unless he desired a change. These departments might be organized for the purpose of lightening his labors to a certain extent. He would not have to look after them actively all the time. He had the right to tell the engineer where to place his cars, and tell him to bring in what he wanted."

Mr. Corbett, a witness for defendant, testified that he controlled the men working *outside* of the furnace. He was bank boss. Thompson, the master mechanic, kept the engineer's time. The men that Corbett controlled loaded pig-iron, unloaded ore and stock charcoal in the shed. He directed the movement of cars at times.

On the part of the plaintiffs, Mr. West testified that he worked as assistant under Root for four years, and one year running an engine; that Root's duties as founder were the charge and control of the inside work of the furnace. He had nothing to do with the outside work, such as moving cars or engines about the furnace.

"It was outside of his business. If he wanted anything done,—anything of that kind,—he went to the man who had charge of the outside work, the banksman, Mr. Corbett."

Witness thinks the engineer was under the control of the master mechanic.

"Root had no control or direction, or right to direct the engineer or brakeman, in the discharge of their duties. Beyond the discharge of his particular duties, he came into no particular contact with these outside men."

Root had 15 men under him, that he hired himself, and outside of them he couldn't order any one to do anything. When he wanted anything, coal, ore, or work done, he could request it, and that was all. Under plaintiffs' testimony, Root had a separate department, the inside work of the furnace, and had nothing to do with the other departments, except he acted through the general manage-

ment or the foreman or boss of such departments. He had no control beyond his own work, though all were engaged in the same common object, to wit, the manufacture of pig-iron. If this makes him a fellow-servant of the engineer, then the court below was correct in its ruling.

By an equal division of this Court in *Sell v. Lumber Co.*, 70 Mich. 479 (38 N. W. Rep. 451), it was held that the plaintiff, who worked in the saw-mill of the company, was a fellow-servant of the men in charge of the warehouse kept for the storage of salt. It appeared in that case that the saw-mill and salt-block were run in conjunction, but the business of one was really separate and distinct from the other. For that reason the Court divided. Here it was all one business, but divided into different departments.

The general doctrine as to fellow-servants is laid down in the text-books as follows:

" All who serve the same master, work under the same control, derive authority and compensation from the same common source, and are engaged in the same general business, though it may be in different grades or departments of it, are fellow-servants." 2 Thomp. Neg. 1026; Cooley, Torts, 544, note; Wood, Mast. & Serv. § 435; Mechem, Ag. § 668.

Nor does it make any difference that the servant guilty of the negligence is a servant of superior authority, unless such superior servant arises to the grade of the *alter ego* of the principal. There are certain duties, however, which belong to the master, which cannot be delegated to an agent or servant, so as to relieve himself of responsibility; among other things, the duty of selecting competent servants, the providing of suitable machinery and appliances, and a safe place to work. The duty of providing a safe and efficient method of moving trains upon these furnace crossings would come under this head. The

engine was not provided with a bell, but there was a whistle, which, if used, would be sufficient warning of its approach. The negligence, if any, consisted in the obstructing of the crossing, and the sudden starting of the cars without blowing the whistle. This was the negligence of the engineer, who was a servant of defendant, against whom no charge of incompetency is made. I am satisfied that the circuit judge, in his ruling that the engineer was a fellow-servant of Root, followed the settled law of this State. *Peterson v. Railroad Co.*, 67 Mich. 102, 109 (34 N. W. Rep. 260); *Mich. Cent. Railroad Co. v. Dolan,* 32 Id. 510; *Smith v. Potter*, 46 Id. 258 (9 N. W. Rep. 273); *Mich. Cent. Railroad Co. v. Austin*, 40 Id. 247; *Quincy Mining Co. v. Kitts*, 42 Id. 34 (3 N. W. Rep. 240); *Greenwald v. Railroad Co.*, 49 Id. 197 (13 N. W. Rep. 513); *Gardner v. Railroad Co.*, 58 Id. 584 (26 N. W. Rep. 301); *Davis v. Railroad Co.*, 20 Id. 105.

It is suggested as an independent proposition that the risk of injury at this crossing from the management of this train of cars was not one assumed by the deceased in his employment; that there was nothing in the nature of his employment to subject him to such a risk. This suggestion is not tenable. These cars were running hourly and daily in the business of defendant. Without such running from the main railway line to the furnace Mr. Root could not have operated the furnace over which he had control. He not only relied upon these cars, but called upon them to furnish coal, etc., for the uses of the furnace. He knew that they must pass over this crossing every few minutes, and he also knew that he must use the crossing more or less in his employment. He therefore assumed the risk that these cars might be handled negligently by his fellow-servants, the persons

employed in running and managing them. The judgment must therefore be affirmed, with costs.

SHERWOOD, C. J., and LONG, J., concurred with MORSE, J.

CAMPBELL, J. I concur in the result, on the ground that there was no liability in the company on any ground that I can conceive.

CHAMPLIN, J., did not sit.