HAINES *v.* LAKE SHORE & MICHIGAN SOUTHERN RAIL-
WAY CO.

1. PERSONAL INJURIES—DAMAGES—EVIDENCE.
    Where, in an action for personal injuries, the declaration
    alleged that, as a result of such injuries, plaintiff was for a
    long time in a condition of severe mental, nervous, and sur-
    gical shock, the testimony of a doctor as to the seriousness of
    the shock to plaintiff was not objectionable as amounting to
    a conclusion.

2. EVIDENCE—HEARSAY—HARMLESS ERROR.
    In an action against a railway company for injuries at a street
    crossing, the admission of the testimony of a passenger that
    the station agent at a station near the place of the accident
    told him, in reply to an inquiry, that the train was 23 min-
    utes late, if erroneous, was not prejudicial, the engineer hav-
    ing given substantially the same testimony as to the lateness
    of the train.

3. PERSONAL INJURIES—EVIDENCE—MORTALITY TABLES.
    Where, in an action for personal injuries, there was testimony
    on the part of plaintiff that his injuries were of a permanent
    character, it was not error to admit the mortality tables in
    evidence.

4. RAILROADS — CROSSINGS — NEGLIGENCE — EVIDENCE — SPEED OF
    TRAIN—CITY ORDINANCE.
    In an action against a railway company for injuries at a street
    crossing, it was not error to admit in evidence a city ordi-
    nance limiting the rate of speed of trains in the city, in view
    of defendant's objection that it was incompetent and irrele-
    vant, and the judge's charge that, if the train was running at
    a greater rate of speed than allowed by the ordinance, it
    might be considered as a circumstance from which negligence
    might be inferred, but, if it was not so running, then the
    rate would not of itself be evidence of negligence.

5. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.
    Where, in an action against a railway company for injuries at
    a street crossing, the testimony on behalf of plaintiff tended
    to show that he stopped his horse, and looked and listened,
    at a point some 75 feet from the track, which was the usual
    and proper place for stopping, because one could there get a

better view of the track than anywhere else, and beyond that could not turn around because of the narrowness of the road; that he continued to look and listen as he proceeded, but discovered nothing to indicate that a train was approaching; that the whistle was not sounded nor the bell rung; and that his view of the train was cut off by intervening objects,—it could not be said, as a matter of law, that he was guilty of contributory negligence, though such testimony was contradicted in several particulars.

Error to St. Joseph; Yaple, J. Submitted December 11, 1901. Decided March 4, 1902.

Case by Thomas J. Haines against the Lake Shore & Michigan Southern Railway Company for personal injuries. From a judgment for plaintiff, defendant brings error. Affirmed.

*Boudeman & Driver*, for appellant.

*Marshall L. Howell*, for appellee.

MOORE, J. This is an action commenced by the plaintiff against the defendant to recover for an injury received by him at a crossing of the highway over the Lake Shore railway track at the city of Three Rivers. He recovered a verdict. The case is brought here by writ of error.

The accident occurred in the early evening. Rock River avenue enters the city of Three Rivers, coming · from the northwest, going towards the southeast, until near the crossing of the Lake Shore railway track, which is on Fifth street, when Rock River avenue turns to the east upon Fifth street. This avenue does not run parallel with the railway company's right of way, but for a portion of the way before reaching Fifth street it runs nearly so. It then turns to the left and crosses the railroad track. The plaintiff was a practicing physician, and on the evening in question he made a professional call on Rock River avenue, and then started for his home in Three Rivers. The train of defendant coming from the north was late. He drove along until he came from 50 to 75 feet from the

1902]　HAINES *v.* LAKE SHORE, ETC., R. CO.　477

track, when he claims to have stopped, looked, and listened, and, not hearing any indication of a train, he continued his journey, continuing to look and listen, when the first intimation which he had of the coming train was the flash of the headlight upon his horse. The plaintiff testified he stopped at the usual distance for stopping at that crossing, and looked and listened. In reply to the question of what he meant by the usual distance he said:.

" At that place the usual distance is where the roadway turns to go across the track. There is quite an abrupt turn. It is at a distance between 50 and 75 feet, somewhere along there. There were two trees over in the road, and, as I stopped my horse to look up the track, the trees were just a little ahead. · They were outlined against the embankment beyond and right up against the sky. My hearing and eyesight were good. I neither heard nor saw the train. There was no signal given by anybody, or any warning of the coming of the train, to my knowledge.

" Q. State whether or not you could have turned at that point, if you had desired to.

"A. I don't believe any one could have turned at that place without backing up and turning. You might take a long time and turn around. '

" Q. For what reason ?

"A. On account of the narrowness of the road, which was occasioned by a great pile of brush on the right-hand side and the embankment on the left-hand side. 　*　*　*

" Q. You say you stopped, and you looked and listened, and heard nothing and saw nothing. Was there any other place along there where you could have stopped and listened so well, or where you could see so well, as at the point at which you did stop, that you know of ?

" A. I don't know of any place that would be near enough. If you went further southeast to the track, you would be less safe; and, if you stopped further back, then you would stop before the road turns, and there would be no use of stopping.

" Q. Why couldn't you stop further back?

·" A. You are going the same direction as the train is. After I started up, my horse went along at the ordinary gait until the horse was very near the track. I think his head was almost to the track, when suddenly I saw the light on the horse, and the horse threw up his head; and

I also saw the light at that time, and he sprung forward, and I realized that the train was there.

"Q. Did the bell ring or whistle blow?

"A. There was no noise, except the rumbling of the train. The buggy did not make any noise as I rode along. There was a light snow falling, and the ground was not frozen. The snow had been damp, I think, during the day, and the wheels cut into the sand pretty well, and made a rut under the wheels. It was so moist that the horse and buggy made no noise."

The evidence shows the track was not straight, but was curved. The witnesses disagree as to how much the view of the track was obstructed by bushes, and by a cut and the earth thrown out of the cut. It was the claim of the plaintiff that the crossing was a dangerous one; that the train was late, and was running at an unusual rate of speed; that no signal of the approaching train was given; that he himself was free from negligence; and that the negligence of the defendant company was the proximate cause of the accident. The record is a very long one. Upwards of 40 witnesses were sworn. There are upwards of 60 assignments of error, and yet the case does not differ substantially from the other cases which find their way to this court, growing out of personal injuries at highway crossings over railway tracks.

Some assignments of error relating to the admission of testimony call for our attention. It is said the court erred in allowing one of the doctors to testify to the seriousness of the shock to the plaintiff, as calling for a conclusion. One of the things alleged in the declaration is that, as the result of his injuries, the plaintiff was for a long time in a condition of severe mental, nervous, and surgical shock. We do not think the testimony was objectionable.

It is said the court erred in allowing a witness who took the train at Schoolcraft to testify that the station agent told him, in reply to an inquiry, that the train was 23 minutes late, because this was hearsay. We do not need to express any opinion upon that subject, because the defendant's engineer, who had charge of the engine, testified to

substantially the same thing, and, if its admission was incompetent, no harm was done.

It is said the court erred in allowing the mortality tables to be introduced in evidence; citing *Foster* v. *Village of Bellaire*, 127 Mich. 13 (86 N. W. 383). There was testimony on the part of the plaintiff that his injuries were of a permanent character, and, if this was true, the testimony was admissible.

Complaint is made of the refusal of the circuit judge to give defendant's requests to charge. The defendant offered 37 written requests to charge. Instead of giving all of these requests, the circuit judge gave some of them, and covered all the others which should have been given in a general charge of exceptional clearness, covering every proper phase of the case. The charge itself covers 17 printed pages of the record, and does not omit anything to the prejudice of the defendant.

Error is assigned upon the admission of an ordinance limiting the running of trains to 8 miles an hour. In reply to an inquiry by the court, the counsel stated his objection was that any ordinance relative to the speed of trains is incompetent and irrelevant. It was afterwards shown that, by resolution, the speed of trains at this point was allowed to be 20 miles an hour. It may be well to quote from 2 Thomp. Neg. (2d Ed.) §§ 1552–1554:

"As already seen, the rights of the general public traveling a common highway and of a railway company crossing it are reciprocal; and, although common convenience and the rights of the traveling public to rapid transit give the railway train precedence upon the crossing, it is upon condition that those in charge of the train will give reasonable warning of its approach, so that a person or a vehicle upon the highway may stop and wait for it to pass. Gates, gatemen, and automatic signals at crossings may dispense with the duty of giving audible signals from approaching trains; but the traveling public have the right to a reasonable and adequate warning of the fact that a train is approaching, whether such warning be given at the crossing itself or from the approaching train.

As to the nature and kind of warning which the railway company is bound to give, the law does not undertake to lay down a rule applicable to all cases. Ordinarily, the ringing of the bell or the sounding of the locomotive whistle as the train approaches the crossing, and within a reasonable distance from the same, is no doubt sufficient; but at crossings peculiarly dangerous the maintaining of gates, gatemen, or automatic signals may be demanded as a reasonable safeguard to the public. As we shall more fully see when treating of the contributory negligence of travelers at railway crossings, judicial opinion tends to the conclusion that, in the absence of directions embraced in statutes and municipal ordinances, the railway company discharges its general duty by giving such warnings as may reasonably be expected to protect travelers who themselves are in the exercise of reasonable care and vigilance. As the law cannot undertake to lay down any exact rule on the subject of the number and kind of signals required, the same depending upon the character of the crossing, the speed of the train, and all the surrounding circumstances which determine the danger to be anticipated and provided against, it becomes in most cases a question of fact for a jury, under proper directions from the court, as in other cases.  *   *   *  This duty exists independently of statutes or ordinances. It is usually regarded by the courts as imperative, and negligence is either conclusively ascribed to its omission, or it is regarded as evidence of negligence to be considered by a jury, provided, however, that this omission is the proximate cause of the accident to the traveler, who is himself without contributory fault. In such cases, a traveler who has exercised what care he can by the use of his faculties is justified in assuming that the railway company will not neglect this duty.  *   *   *

"Although the legislature has granted to a municipal corporation a general power to make regulations upon this subject, yet this power is subject to the common-law principle that municipal ordinances must be reasonable, and that whether they are reasonable or unreasonable is a question to be determined by the judicial courts. Exercising this power, it has been held that a municipal ordinance requiring the ringing of the bells of locomotives at street crossings, and the presence of flagmen at the more important crossings, is reasonable and proper, and so of an ordinance requiring the ringing of the bell of a locomo-

tive within the corporate limits of the city; and the ordinance is applicable even to the yards of the railroad company, situated in a thickly settled portion of the city, and traversed by people at all times and places; and so of an ordinance requiring the bell of a locomotive to be continually rung while the locomotive is in motion within city limits, and prohibiting the running of locomotives at more than five miles an hour, as applied to a street crossing within three blocks of the railway depot in the city."

We do not think the court erred in admitting the ordinance in evidence, in view of the objection, and his charge as to what constituted negligence on the part of defendant.[1]

The most serious question in the case is, Did the court err in submitting the case to the jury? Counsel for defendant say the court should have directed a verdict for the defendant. In the case at bar the statement of plaintiff that he stopped and looked at the proper place, because at that point he could get a better view of the track than at any other point, and that, because of the narrowness of

---

[1] Viz.: "The plaintiff claims, as I have said, that the defendant was running its train at a greater rate of speed than 20 miles an hour within the limits of the city of Three Rivers, in violation of the ordinance which has been introduced in evidence. For the purpose of this trial, you will assume that said ordinance was valid and in force in said city at the time of the accident in question. The plaintiff agrees that, for the purpose of this trial, it shall be considered as limiting the rate of speed of railway trains within the limits of said city to 20 miles an hour, or, in other words, as permitting a rate of speed of 20 miles an hour. The defendant claims that the train was not running to exceed the rate of 20 miles an hour. If you find from the evidence in the case that this train was running at a greater rate of speed than 20 miles an hour when approaching the crossing in question within the limits of said city, then such act on the part of the defendant may be considered by you as a circumstance from which negligence may be inferred in determining whether the defendant was or was not guilty of negligence. If you find that the rate of speed of the train in approaching the crossing within the limits of the city of Three Rivers was no greater than the rate permitted by said ordinance,—that is, if it did not exceed 20 miles an hour,—then the rate of speed at which the train was running cannot of itself be considered by you as a circumstance from which negligence may be inferred.

"But it may be negligent for a train to approach a crossing in a city or village at a rate of speed no greater than that permitted by an ordinance of the city or village. But there must be facts and

the road nearer the track, one could not turn around, if it was necessary to do so, was sustained by the testimony of several witnesses. The case is nearly parallel to *Whitman* v. *Railroad Co.*, 156 Pa. St. 175 (27 Atl. 290), where the court said:

"The learned judge nonsuited the plaintiff for violation of the rule which requires a traveler, about to cross a railroad track, to stop, look, and listen, because he held that the evidence showed that, where plaintiff stopped, the trains could neither be seen nor heard. The rule has been enforced and reiterated in so many cases, from *Pennsylvania R. Co.* v. *Beale*, 73 Pa. St. 504 (13 Am. Rep. 753), down, that it needs no further discussion. As was said in *McNeal* v. *Railway Co.*, 131 Pa. St. 184 (18 Atl. 1026), experience has confirmed the wisdom of its adoption, and it will not be relaxed nor pared down by exceptions. But it is a rule which in its nature is applicable only to clear cases, to those which practically only admit of one view.

"We are unable to agree with the learned judge that this is such a case. It is true that the place where plaintiff stopped was 100 feet away from the track, and afforded a very short view, about 35 yards to the eastward, and that further view was then cut off, not only by a curve in the

circumstances, apart from the rate of speed itself, tending to show that it was careless to run at the rate of speed complained of, or a finding of negligence would not be warranted. While there may be circumstances which would require a less speed than the rate permitted by such ordinance, it is only the force of those circumstances which creates such duty. If, in view of the situation of the crossing in question, and its surroundings as shown by the evidence, ordinary, reasonable care and prudence, and due regard for public safety, required the railroad company to run at a less rate of speed, then it was the duty of the company to observe such care and prudence, and its failure so to do would be negligence on its part. The ordinance of the city of Three Rivers, permitting the company to run its trains within the limits of the city at the rate of 20 miles an hour, would not justify such speed, if in fact negligent in view of the surrounding circumstances. It is for the jury to determine, from the evidence in the case, the rate of speed at which the train in question was running when approaching the crossing, and at the time of the accident, and whether or not such speed was negligent; and, in determining that question, you may consider, not only the testimony of witnesses as to their opinion of its speed, but also the testimony concerning the manner in which the train was stopped, the distance run by the train after striking the carriage of plaintiff and before it could be stopped, and all of the facts and circumstances bearing upon the question as shown by the evidence."

track, but by a hotel. But, notwithstanding these dis-
advantages, five witnesses besides the plaintiff, one of
them a liveryman, testify that this was the proper and
customary stopping place, used by drivers coming in that
direction. The witness Ervin explains why this place is
preferred, because there is a break or level place in the
road, which then runs at a down grade until so near the
track that some horses cannot safely be checked there.
Plaintiff and the driver testified that they not only stopped
at this point, and waited until two trains in opposite
directions had passed, but then drove on, and 'slacked up'
nearer the track, 'to see or hear whether there was any-
thing coming.' In the face of this testimony, we do not
think the court could safely say, as matter of law, that
the place where plaintiff stopped was not one which
reasonable prudence would sanction for the purpose."

See *Grenell* v. *Railroad Co.*, 124 Mich. 141 (82 N. W.
843); *Chicago, etc., R. Co.* v. *Miller*, 46 Mich. 532 (9 N.
W. 841).

In this case the claim that no signals were given by
ringing the bell or blowing the whistle was not simply
that the witnesses did not hear them, but some of the wit-
nesses say they were listening, that they heard the rumble
of the train, and one of them says no whistle was blown
until the train was directly upon the crossing. This testi-
mony was disputed by the train men and other witnesses
called by defendant. The question of whether the train
could be seen or not was also a disputed question in the
case about which witnesses differed. In *Becker* v. *Rail-
way Co.*, 121 Mich. 580 (80 N. W. 581), it is said:

"The rule is well settled that the question of plaintiff's
contributory negligence should be submitted to the jury
when the testimony is conflicting, or where the case is not
free from doubt upon the facts, or where candid and in-
telligent men might reach different conclusions upon the
facts. *Swoboda* v. *Ward*, 40 Mich. 420; *Teipel* v. *Hil-
sendegen*, 44 Mich. 461 (7 N. W. 82); *Chicago, etc., R.
Co.* v. *Miller*, 46 Mich. 532 (9 N. W. 841); *Lewis* v.
*Railway Co.*, 54 Mich. 55 (19 N. W. 744, 52 Am. Rep.
790); *Palmer* v. *Railroad Co.*, 56 Mich. 1 (22 N. W.
88); *Staal* v. *Railroad Co.*, 57 Mich. 239 (23 N. W.

795); *Luke* v. *Mining Co.*, 71 Mich. 364 (39 N. W. 11);
*Dundas* v. *City of Lansing*, 75 Mich. 499 (42 N. W.
1011, 5 L. R. A. 143, 13 Am. St. Rep. 457); *Adams* v.
*Iron Cliffs Co.*, 78 Mich. 271 (44 N. W. 270, 18 Am. St.
Rep. 441); *Brezee* v. *Powers*, 80 Mich. 172 (45 N. W. 130);
*Underhill* v. *Railway Co.*, 81 Mich. 43 (45 N. W. 508);
*Guta* v. *Railway Co.*, 81 Mich. 291 (45 N. W. 821);
*Engel* v. *Smith*, 82 Mich. 1 (46 N. W. 21, 21 Am. St.
Rep. 549); *Roux* v. *Lumber Co.*, 85 Mich. 519 (48 N. W.
1092, 13 L. R. A. 728, 24 Am. St. Rep. 102); *Graves* v.
*City of Battle Creek*, 95 Mich. 266 (54 N. W. 757, 19
L. R. A. 641, 35 Am. St. Rep. 561)."

See, also, *Willet* v. *Railroad Co.*, 114 Mich. 411 (72
N. W. 260); *Ryan* v. *Railway Co.*, 123 Mich. 597 (82 N.
W. 278).

The case was very carefully tried, and we do not find
any reversible error in it. Judgment is affirmed.

Hooker, C. J., Grant and Montgomery, JJ., con-
curred. Long, J., did not sit.