McCAULEY *v.* MICHIGAN CENTRAL RAILROAD CO.

1. MASTER AND SERVANT — CONTRIBUTORY NEGLIGENCE — RAILROADS—DANGEROUS PLACE.

A car repairer who went between the locomotive and coach of a passenger train while the defendant's locomotives were switching and moving the cars about, and making up the train, could not recover for injuries sustained by him while trying to adjust the coupler when it appeared that he knew of the danger and unnecessarily went into the dangerous situation.[1]

2. SAME—DISCOVERED NEGLIGENCE—FELLOW-SERVANT.

If there was any negligence on the part of defendant's servants in not preventing further movement of the train after discovering plaintiff's danger, and after he had been caught between the buffers, it was negligence of a fellow-servant.

3. SAME.

The act of giving notice to an oncoming engine not to run against the cars between which plaintiff was caught was not one of the nondelegable duties of the master.

[1] Assumption of obvious risks of hazardous employment, see note in 1 L. R. A. (N. S.) 272.

Error to Wayne; Murfin, J. Submitted June 26, 1911. (Docket No. 50.) Decided October 2, 1911.

Case by John Howell McCauley against the Michigan Central Railroad Company for personal injuries. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*Thomas L. Dalton* (*James S. Doyle*, of counsel), for appellant.

*J. W. Dohany* (*Henry Russel* and *Frank E. Robson*, of counsel), for appellee.

STONE, J. This is an action on the case to recover damages for a personal injury sustained by the plaintiff, resulting in the amputation of his left arm, while in the employ of the defendant at its passenger station in the city of Detroit. The plaintiff was employed as a car repairer in the month of June, 1907. He was first assigned to do car repairing work on what is known as the "repair track," at the passenger station of defendant. After plaintiff had been working on the repair track for some months, he was sent by the assistant foreman of the repairers to help the air man on track No. 5. This track was one of the main tracks running into the station, and was used by arriving and departing trains. Trains were broken up and made up on this track, coaches examined for defects, and slight repairs were made there. The plaintiff assisted in uncoupling the air hose and engine, coupling the safety chains, and such work. He was injured while working on this track, on December 18, 1907. There was a sleeping car on this track next to the deadwood at the time. A train had arrived on this track, and the engine had pulled in close to the sleeping car. This train was to be broken up, and another train was to be made up there. This train was a regular scheduled train of the defendant, known as the "Wolverine." Some of the coaches of the train that had arrived

were to be used, some taken off, and others added to make up the "Wolverine." The breaking and making up of these two trains required about 15 minutes. Several engines were used in doing the work, and considerable expedition was required.

Just prior to the time the plaintiff was injured, he had gone up to the head of the train to cut off the engine, as he had been directed to do. He testified that he pulled up the lever at the side of the coach to raise the coupling pin, so that when the train pulled out of the station the incoming engine would be uncoupled; that he found, however, as soon as he let go the lever the pin would drop down, and the result would be that the coupler would lock; that he then asked the engineer to pull up while he had the lever raised, but that the engine couldn't go any further on account of the sleeping car; that he then stepped back and looked down the track, as far as the curve, which was about 200 to 250 feet west, and saw no engine coming; that he then stepped in between the coach and the engine to close the coupler with his hand, so that the jaw would be out of position to couple. While he was attempting to do this, an engine on the other or west end of the train pushed the train forward; that he felt the train sliding up on him, and attempted to jerk out, but his left forearm and the fingers of his right hand were caught and held between the buffers of the coach and engine, and he could not release himself; that he was not seriously injured, and was perfectly conscious, and would not have suffered more than a bruise, if further motion of the train had been prevented. The testimony of the plaintiff was that he remained caught in that position for about five minutes. Other testimony of plaintiff's witnesses was to the effect that he remained there from one to three minutes. The plaintiff testified that he made an outcry for help, and that as soon as he was heard a crowd of employés and passengers gathered there, and that he told them not to let the other engine come in, referring to the second engine, and not the one that had pinned him in that posi-

tion. Attempts were made to release him by driving up the coupler pin, but were not successful, and while he was held there, and unable to extricate himself, the second engine backed the train onto his arm, breaking it; the lever was raised, the strain released, and the plaintiff dropped out. The plaintiff's evidence showed that it was the second movement of the train which caused the injury to the plaintiff's arm and made it necessary to amputate it. The plaintiff testified that one Williams had charge of the operating of the trains in and out of the station, and gave the orders as to the making up of the trains, and had power to discharge men in the yard; that Williams was present when plaintiff was fastened between the engine and car, and that plaintiff called to Williams, saying: "Don't let that engine come in again; stop that engine coming in; don't let the engine come in" (referring to the switch engine); and that Williams did not do anything but keep the crowd back, and no steps were taken to stop the engine which caused the injury. It appeared that the plaintiff had worked for the Duluth, South Shore & Atlantic Railroad for about five years coach cleaning and making slight repairs, at L'Anse and Michigamme, and came from there direct to the defendant. He had also worked previously in a planing mill at Sault Ste. Marie. At the time of the injury complained of, the plaintiff was 49 years of age. That the plaintiff fully understood and appreciated the danger of going between the engine and the car is made clear by his own testimony, as follows:

"I knew of this switching being done every day on the end of the train. It was done every day just the same. I knew of this; they always do it as fast as they can. The train generally is remade and gets out again in 10 to 15 minutes after it gets in. From the time the train arrives until it departs, there is something being done, but not steady on that track, either by pulling the coaches out or shoving others in all the time in reference to making up that train. They are coming in and out all the time in that intervening 10 or 15 minutes. They are working

steady on the one train, and all the coaches are pulled in or out on this one track. The train is entirely broken up, from the time it arrives at Detroit until it leaves. They used automatic couplers on the D. S. S. & A. R. when I worked there. These would be worked by an operation at the side of the car. The knuckle of the coupler swings around on a bolt. I may have uncoupled an engine before going with the Michigan Central, but I didn't make a habit of it; it was very seldom. I was around the ends of the cars and saw the couplers; they seemed to me to be all the same. * * * I had noticed these trains come in and out and the making up of these trains, and the engine coming in on track 5 from the time I first went down there; and I knew from the time that train arrived until it left there was always switching being done on it. * * *

"*Q.* Had you in the time you worked there previous to December, 1907, ever passed in between the buffet car and the engine after it was separated?

"*A.* Yes, sir; I had.

"*Q.* And you had done that a number of times?

"*A.* Yes; but there is a wide space between them.

"*Q.* The question is, had you done it a number of times?

"*A.* I don't know as I ever done it, but I assume I did; working around cars you are doing lots of things you don't remember.

"*Q.* Do you know whether every time you went through there there was a wide space?

"*A.* I could not say.

"*Q.* Well, if there was only a narrow space, you would not attempt to go through?

"*A.* No; I would not.

"*Q.* And if there was only a narrow space you would not attempt to get in between the buffer, would you?

"*A.* I would not.

"*Q.* Why would you not?

"*A.* On account of the danger.

"*Q.* And that danger is because you knew there was switching being done on the other end of the train?

"*A.* Yes, sir. * * *

"*Q.* When you were reaching in there or started to go in there to close the knuckles with your left hand, you were not looking at anything else only that knuckle?

"*A.* That is all.

"*Q.* And at the time you were doing that, from the

previous experience which you had around that train, did you not think or know that there might be switching on the west end of that train going on at the same time?

"*A.* I looked to see before I went in if there was, and there was no engine there. Before I went in, I stepped out on the platform, and looked down towards the west end of the train. * * *

"*Q.* When you went out to look, what did you expect was coming back onto that train?

"*A.* I expected the engine.

"*Q.* Just the engine alone?

"*A.* Yes, sir.

"*Q.* You expected that engine was coming in?

"*A.* I did.

"*Q.* You went out to look to see whether it was coming in or not?

"*A.* Yes, sir.

"*Q.* You knew it would shortly come in?

"*A.* I did.

"*Q.* It wasn't in on the end of the train when you looked?

"*A.* No."

At the close of the plaintiff's case, counsel for defendant moved the court to direct a verdict for the defendant for the reasons following:

*First.* That there was no showing of any negligence on the part of the defendant which caused the injury.

*Second.* That the plaintiff assumed the risk.

*Third.* That plaintiff was guilty of contributory negligence.

The motion was granted, and a judgment for the defendant was entered; the trial judge having charged that if there was any negligence, after the plaintiff was found in a place of danger, it was the negligence of fellow-servants, and that Williams was, under the evidence, a fellow-servant. The plaintiff has brought the case here, and error is assigned upon the charge, and also upon certain rulings relating to the introduction of evidence.

After a perusal of this record, it seems very clear to us that the plaintiff was familiar with the situation; it appearing that for three months he had been employed

about the same line of work; that he voluntarily and unnecessarily went into a dangerous place where he was caught; and that he was guilty of contributory negligence in so doing. It is incredible that he did not know that he would be in peril in thus exposing himself to danger.

But it is urged by the plaintiff that, though we should find that the plaintiff was guilty of contributory negligence in placing himself where he was caught between the engine and car, this would not bar a recovery, and that the doctrine of last clear chance or discovered negligence should be applied. The difficulty in the application of this doctrine is that, if there was any negligence after the plaintiff was discovered in a place of peril, it was the negligence of fellow-servants, under the repeated decisions of this court. While it may seem almost inexplicable that the second engine was not stopped, and the serious injury of the plaintiff prevented, yet we cannot say that everybody present did not do what he believed to be the most effective thing to extricate the plaintiff from his perilous situation.

But if there was any negligence it was not the negligence of the defendant. All of the persons working about the train, as shown by the evidence, were fellow-servants of the plaintiff; and if there was any negligence on the part of any of them, resulting in the injury of the plaintiff, he could not recover therefor against the defendant. The general rule in this State, as repeatedly held by us, is that—

"All who serve the same master, work under the same control, derive authority and compensation from the same common source and are engaged in the same general business, though it may be in different grades or departments of it, are fellow-servants." *Adams* v. *Iron Cliffs Co.*, 78 Mich. 271–288 (44 N. W. 270, 276 [18 Am. St. Rep. 441]).

See, also, *Beesley* v. *F. W. Wheeler & Co.*, 103 Mich. 196 (61 N. W. 658, 27 L. R. A. 266); *Schroeder* v. *Rail-*

*road Co.,* 103 Mich. 213 (61 N. W. 663, 29 L. R. A. 321, 50 Am. St. Rep. 354); *Gavigan* v. *Railway Co.,* 110 Mich. 71 (67 N. W. 1097); *Morch* v. *Railway Co.,* 113 Mich. 154 (71 N. W. 464); *Erickson* v. *Mining Co.,* 130 Mich. 476 (90 N. W. 291); *Page* v. *Pure Food Co.,* 142 Mich. 17 (105 N. W. 72); *Amoe* v. *Engineering Works,* 151 Mich. 212 (114 N. W. 1010); *Corey* v. *Iron Co.,* 151 Mich. 558 (115 N. W. 737); *Ferry* v. *Gas Producer Co.,* 153 Mich. 266 (116 N. W. 1073); *Stever* v. *Railroad Co.,* 160 Mich. 207 (125 N. W. 47); *Peters* v. *Railroad Co.,* 165 Mich. 217 (130 N. W. 602). The act which it is claimed that Williams neglected to perform—that of giving notice to the oncoming engine—was delegable, and such a one as might be, and generally is, entrusted to subordinates. In other words, the duty, if any, was a delegable duty.

We have examined the assignments of error relating to the rulings upon the introduction of testimony, and we find no reversible error in the rulings of the trial court.

We are of opinion that the circuit judge reached the correct conclusion in the case, and the judgment below is affirmed.

OSTRANDER, C. J., and BIRD, MOORE, and McALVAY, JJ., concurred.