BALDERSON *v.* PORTLAND TELEPHONE CO.

NEGLIGENCE — PERSONAL INJURIES — TELEGRAPHS AND TELEPHONES—CONTRIBUTORY NEGLIGENCE.

   Evidence that defendant's linemen, in placing wires, laid certain wires across the driveway and yard of plaintiff, that plaintiff supposed the men had ceased working and, though he had been informed that they might recommence work at any time, left his team, on a subsequent day, standing for a short time directly over the wires, that he looked to see if the men were working before he left the horses standing, but could see no one, and that defendant's servants began tightening the wires and raising them while the animals remained above the wires, frightening them and causing serious injuries to plaintiff, presented a question for the jury as to plaintiff's contributory negligence, and the court should not have directed a verdict for defendant.

Error to Ionia; Davis, J. Submitted November 13, 1912. (Docket No. 10.) Decided December 17, 1912.

Case by John C. Balderson against the Portland Telephone Company for personal injuries. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Reversed.

*Alfred R. Locke* and *George E. Nichols*, for appellant.

*Scully & Davis*, for appellee.

STONE, J. This suit was brought to recover damages for an injury which the plaintiff claims to have suffered by reason of the negligence of the defendant in the manner hereinafter described. The case was tried before a jury. At the close of the plaintiff's testimony the trial court, upon the motion of defendant's counsel, directed a verdict for the defendant, on the ground that the plaintiff was guilty of contributory negligence, and a judgment for defendant was entered.

At the time of the alleged injury the plaintiff resided upon a farm in the township of Portland, fronting on the highway extending northerly from the village of Portland. The defendant is a telephone company, and in October, 1910, was engaged in building and extending one of its telephone lines upon the highway in front of plaintiff's farm and residence, and on the west side of the road near the highway line.

On October 26, 1910, the defendant having erected its poles to a point some distance north of plaintiff's residence from the village of Portland, and having strung two wires upon the poles and crossarms to the second pole south of the driveway of the plaintiff's yard, they were then made fast to the said pole.

On plaintiff's premises there was situated a dwelling house just west of the highway, on the south side of which a driveway extended from the road, which driveway the plaintiff used in going to his residence, and to barns situated southwesterly from the house. There were two trees standing in front of plaintiff's house just north of the driveway and near the highway line. It was arranged between plaintiff and defendant's superintendent that these trees, one of which was somewhat defective, should be cut down, and plaintiff assisted the defendant in cutting them, and they were felled in a southwesterly

direction into plaintiff's yard and across his driveway.

The defendant left the trees as they were felled in the yard, and then strung two wires, a continuation of the two wires already strung, and tied to the second pole south of plaintiff's driveway, northerly over the crossarms of the poles which had already been set to the north, along the west side of the highway. These two wires that extended north from the second pole south of plaintiff's driveway were left hanging loose from the crossarms, and in front of plaintiff's residence, and across said driveway. They were left sagging and lying loose upon the surface of the ground over the driveway and in front of the house. There were shade trees extending north from in front of plaintiff's house, through which the wires passed as they rested over the crossarms. After the wires were strung, as aforesaid, to the north, the defendant's employés working upon the line came back and got their wagon from which they strung the wires, and left the vicinity of plaintiff's residence. He did not know where the men had gone, and did not know where they were afterwards working. The plaintiff testified:

"I didn't know the men were up there by Ben Smith's place [Ben Smith's place being the next farm north on the west side of the road]. Didn't know where they had gone. I didn't have any particular talk with Mr. Smith [defendant's manager] as to where they might be working the next day. When they were putting the lines through the trees north of where the trees were felled, I stood at the foot of one of the trees, and I said to Mr. Smith, 'Do you expect to put this line right up next?' He says: 'I can't say;' he says, 'We wired on the other side of the town * * * for 20 phones. We have been expecting the phones for three weeks, and as soon as they come we will leave this work and install those phones, and they are liable to come every day.'"

After the trees were felled, the plaintiff worked at trimming the brush from them, when the same were felled, and piled some of the brush, which work he began while the defendant's men were there. He did not haul the

trees away the same day they were felled. After the trees had been trimmed, the plaintiff, having to draw a load of corn, passed out of his yard by going south of his driveway, and, raising up the wires that were lying on the ground, he drove underneath them.

On the morning of October 28th, about 8 o'clock, the plaintiff undertook, with his team, to haul the logs away and into the back portion of his yard, in order to get them out of the driveway so he could use it in hauling corn. Before attempting to haul the trees away on the morning of the 28th, the plaintiff finished trimming them and cleaning up the brush and in doing this was working along the highway track; and he testified that he could tell if any of the linemen went by, and that he did not see any of them going to work that morning, and did not know that the men had stayed in the country to the north of his place overnight. He got out his team to use in hauling the logs, and drove them to the water tank west from the driveway, and at this time plaintiff climbed upon the windmill, so that he could see down the road to the north, and looking he saw no one working on the poles as far as he could see. He then, believing that no one was working up the line to the north, undertook to draw the logs away. Plaintiff first hitched to the stone boat and drew away some of the wood that he had cut out of the tops. Then he hooked onto one of the trees, with his team headed to the north, and drew it along past the house to the side of the lane by the windmill. After doing this he hitched to some limbs and drew them out near his woodpile, and then drew away another stone boat load of wood. Then he hitched to the tree that fell farthest south, and as he hitched to this tree his team stood northeasterly in the driveway, headed toward the road, about where the road line was. As his horses stood in this position, they were over the wires lying on the ground. After hitching to the tree, the first thing he did was to roll the log over to the east, on account of a projecting limb, which would prevent him from swinging

the log with the team.   The butt of the log lay heavy on the ground.   He took a handsaw, and was sawing the limb off when his attention was called to his horses by a man passing by, who said:

"Is that the way you hang up your team?"

Plaintiff turned and saw that the wire was right under the horses, just behind the nigh horse's front legs, and just in front of the off horse's hind legs.   The plaintiff testified as follows:

"I stepped right to the wire and tried to ride it down and get the horse over it.   I dropped the traces the first move I made, and took hold of the wire on that side and tried to hold it down.   I looked under the team, where a snap was fast to the wire on the quarterback strap on the nigh horse.   I stepped around that side and unsnapped it. The wire was under the horse's belly, near the bellyband. It was not so tight at that instant but what I could unsnap it.   I saw that it was getting tighter fast.   I made several lunges down on the wire like that (illustrating), and tried to get it free, where the team could get over it. My impression was that some stock were caught in the wire.   It ran through Ben Smith's field inside of his fence.   He had shifted it out in the road.   I might say I was positive no one was working on the line.   I had taken that precaution.   When I was trying to ride the wire down, I reached in my hip pocket for a pair of wire pinchers.   I didn't have any.   I rode the wire again, and spoke to the horses, and the nigh one jumped over.   I wouldn't say that the horses were making any disturbance until that one jumped.   I was somewhat excited, of course.   I distinctly remember the off horse began to wring his tail at the time the nigh horse jumped over the wire.   I knew he was excitable.   I, perhaps, was getting more excited.   He made a couple of lunges up in the air with his hind parts, and the wire went up with me, and I still hung on and tried to keep it down.   The second time he went up in the air was the last I remember."

Plaintiff testified that when he regained consciousness he was on the ground at least a dozen feet in the yard from where he was standing by the wires, and that he was

thrown and struck upon his back on the ground, and was severely injured. The testimony shows that Smith and two other employés of defendant were pulling the wires at the time they were raised under the horses, and that one wire broke at the time the horses jumped away. We have here, at the expense of tediousness, stated the facts as claimed by the plaintiff, and in the view most favorable to his claim, because of the course which the trial took.

There was evidence tending to show negligence of the defendant because of want of notice to plaintiff of raising the wire, which would at least make a question for the jury. The trial judge found that defendant was negligent, and that question is not before us. The only questions raised by appellant and necessary to be considered are: Did the court err in directing a verdict for the defendant, and in holding that the plaintiff was guilty of contributory negligence as matter of law?

It is urged by the defendant's counsel that plaintiff was fully aware of the danger that lay in his way if his team stood upon or over the wires while they were being pulled up, and that he had been told, in substance, that defendant was likely to put up the line at any time; that plaintiff had no excuse for the relaxation of vigilance, nor of forgetting to exercise a degree of prudence and care; that the danger was fully appreciated by him; and that inattention is never excusable.

It must be conceded that plaintiff knew that the wires were lying upon the ground across his driveway, and that they were in plain sight, and he knew that if defendant raised the wires from the north end of the line his team might get in the tangle. But it is said by plaintiff that he had been told by defendant's manager that they might stop the work there and install certain phones, and that by watching and looking, as described, he had done all that an ordinarily prudent man would do under the circumstances. On cross-examination the plaintiff testified as follows:

"*Q.* Did you know the wires were under your horse?

"*A.* No, sir.

"*Q.* Did you look to see?

"*A.* No, sir.

"*Q.* You knew the wires were there?

"*A.* Yes; I knew the wires were there. I wasn't thinking of the wires at the time.

"*Q.* Didn't give any attention to them?

"*A.* At that instant, no; I didn't.

"*Q.* Did you give any attention to the wires, when you drove your horses out, to see whether they stood east of the butt of the tree, in line with the wires?

"*A.* No, sir.

"*Q.* Didn't give any attention to that?

"*A.* I don't think I did. I was satisfied they weren't working on the line, because, as I said this morning—

"*Q.* You knew the wires were there?

"*A.* Yes, sir.

"*Q.* And paid no attention to it?

"*A.* No, sir.

"*Q.* Then, in driving your horses out to roll this log over, you must have driven them right directly on the wires?

"*A.* Judging from what happened, they must have been on the wires.

"*Q.* As they stood there right in line of where the wires were, where you knew them to be?

"*A.* Yes; where I knew them to be.

"*Q.* You had your mind on the thought of trimming this limb off, so it might not break the window, so you left your team standing there?

"*A.* Yes; I had the bucksaw there, so I sawed the limb off; yes, sir.

"*Q.* And you left the team standing right where they were?

"*A.* Yes, sir.

"*Q.* You gave no further attention to the team?

"*A.* I gave no further attention to the team until he called attention to the fact they were hung up."

Plaintiff then repeated how he had climbed the windmill and looked north, and how he had watched for the men going north in the morning, and had not seen them pass.

We are of the opinion that the question of plaintiff's contributory negligence was for the jury, and that it can-

not be said, as matter of law, that he was guilty of such negligence. The following authorities bear upon the subject: *Wolverton* v. *Village of Saranac,* 171 Mich. 419 (137 N. W. 211); *Wallin* v. *Railway Co.,* 172 Mich. 466 (138 N. W. 270); *McTiver* v. *Grant Township,* 131 Mich. 456 (91 N. W. 736); *Davis* v. *Railroad Co.,* 142 Mich. 382 (105 N. W. 877); *Hovey* v. *Telephone Co.,* 124 Mich. 607 (83 N. W. 600); *Friesenhan* v. *Telephone Co.,* 134 Mich. 292 (96 N. W. 501); *Thomas* v. *Telegraph Co.,* 100 Mass. 156; Baldwin on Personal Injuries, §§ 179, 270, 446–454.

We think that the case should have been submitted to the jury under proper instructions.

For the errors assigned, the judgment of the circuit court is reversed, and a new trial granted.

MOORE, C. J., and STEERE, McALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.