TEACHOUT *v.* GRAND RAPIDS, GRAND HAVEN & MUSKE-
GON RAILWAY CO.

1. ELECTRICITY—TELEGRAPHS AND TELEPHONES—NEGLIGENCE—PER-
SONAL INJURIES.
   Defendant caused certain uninsulated high-tension wires
   to be strung from 15 to 18 inches above the wires of a
   telephone company. The telephone company had been in
   operation and its wires had remained at that point sev-
   eral years. In making some necessary repairs at the
   top of a pole a lineman employed by the telephone com-
   pany to repair its lines came in contact with high power
   wires and was killed. *Held*, that the question of negli-
   gence was one of fact for the jury.

2. SAME—CONTRIBUTORY NEGLIGENCE—DIRECTED VERDICT.
   Where the issue in a case is whether contributory negli-
   gence did or did not exist, and this depends upon infer-
   ences to be drawn from the attendant circumstances, and
   honest, intelligent, and impartial men might differ about
   them, the case should be submitted to a jury.

3. SAME—CONTRIBUTORY NEGLIGENCE.
   Also, it was a question for the jury whether plaintiff's
   intestate was guilty of contributory negligence in coming
   into contact with defendant's high power wire while he
   was repairing the telephone company's insulation and
   wiring.

4. SAME—PRESUMPTION OF DUE CARE—EVIDENCE—DEATH.
   In the absence of witnesses who could testify to the facts
   relating to the manner of his injury and death, at the
   moment of contact with the power wires, the court prop-
   erly charged that the decedent must be presumed to have
   exercised due care.

5. SAME—MASTER AND SERVANT—ASSUMED RISKS.
   The principle of assumption of risk rests on the ground
   of an implied contract between the master and his servant
   that the latter shall assume the risk of all dangers in-
   cident to his employment. But as to strangers to the
   contract whose negligence causes injury to the servant,
   no such defense exists.

6. SAME—POWER COMPANY—NEGLIGENCE—JOINT LIABILITY.
   Although the power company which supplied the current
   had contracted with its codefendant, the railway com-
   pany, for the use of wires owned by the railroad cor-
   poration, stipulating that the power company should not
   assume any responsibility for the transmission line, it
   was liable for negligently maintaining the wires too near
   the telephone wires, under testimony showing that it
   supplied electricity to other consumers by means thereof.

Error to Mecosta; Barton, J. Submitted October
15, 1913. (Docket No. 46.) Decided March 27, 1914.

Case by Winfield S. Teachout as administrator of the
estate of James R. Teachout, deceased, against the
Grand Rapids, Grand Haven & Muskegon Railway
Company and the Grand Rapids-Muskegon Power
Company for the negligent killing of decedent. Judg-
ment for plaintiff. Defendants bring error. Affirmed.

*Carroll, Kirwin & Hollway,* for appellant Grand
Rapids, Grand Haven & Muskegon Railway Co.

*Travis, Merrick & Warner,* for appellant Grand
Rapids-Muskegon Power Co.

*Broomfield & Worcester,* for appellee.

MOORE, J. The Detroit, Grand Haven & Milwaukee
Railroad extends from the city of Grand Rapids to
Grand Haven. It crosses the highway at a point called
the high bridge. The Michigan State Telephone Com-
pany, prior to 1899, constructed a telephone line along
this highway. The defendant the Grand Rapids,
Grand Haven & Muskegon Railway Company operates
a third rail system of electric railway from Grand
Rapids to Muskegon, with a branch to Grand Haven.
It was built prior to and began to operate in February,
1902. It passed over the steam railroad on an iron
bridge, not far from which is a telephone pole belong-
ing to the Michigan State Telephone Company, which

in June, 1911, carried on two cross-arms 12 telephone wires. When the electric line was built the electric railway company strung a line of high-tension wires to supply its line with electricity, and manufactured its own electricity until about the first of the year 1906, when the defendant the Grand Rapids-Muskegon .Power Company furnished the current under a contract which it made with the interurban road, using the high-tension wires mentioned above. In June, 1911, there were three of the high-tension wires, carrying 16,500 volts of electricity, strung on one crossarm, and they passed diagonally over the telephone wires. The center one of the three was, according to the testimony of the plaintiff, but 15½ inches above one of the telephone wires; while each of the other high-tension wires was 2 or 3 inches farther away from any telephone wire. According to the proof offered by the defendant, the high-tension wires were 2 or 3 inches farther away from the telephone wires. The high-tension wires were copper, carrying no insulation where they passed over the telephone pole and wires before described. The nearest high-tension pole upon which the high-tension wires were strung was 18 feet from the telephone pole. While at work upon this telephone pole plaintiff's intestate, James R. Teachout, then 24 years of age, received a shock resulting in his death within one hour thereafter. From a verdict and judgment in favor of the plaintiff, the case is brought here by writ of error.

Many assignments of error are discussed; but the meritorious ones may be grouped as follows:

(1) Were the defendants negligent?

(2) Was the decedent guilty of contributory negligence as a matter of law?

(3) Did the court err in charging the jury as to whether it was to be presumed that decedent was in the exercise of due care at the time he received the shock?

(4)  Did the decedent assume the risk?

(5)  Upon this record, can the judgment be sustained against the defendant the power company?

The decedent was an experienced lineman. He had worked in that capacity from April, 1911, until his death, June 2, 1911, and had been in the employment of the telephone company in various capacities for nearly three years. He was regarded as a prudent, careful, and efficient man. During the forenoon of June 2, 1911, it rained some. The patrol crew was made up of Mr. Short, a foreman, and the decedent, who made the repairs, and a third man, Mr. Winterstein, who drove the team, and had charge of the wagon, with its supplies. As they were crossing the highway bridge, Mr. Teachout said there was an insulator off of the telephone pole that stood just north of the interurban bridge. They drove across the bridge and interurban track, and Mr. Winterstein, who was driving, stopped the team in the traveled portion of the highway 20 or 25 feet from the telephone pole. Mr. Teachout got off the wagon, and having put on his climbing spurs, took an insulator and such tools and materials as he needed to make the necessary repairs. We quote from the foreman's testimony:

"He started up the pole and got up 4 or 5 feet, and I remember of speaking to him, and speaking about the wires being very hot, and to be careful. He wanted to know how I knew they were hot, and I told him, when we were putting a piece of cable in at Berlin previous to this, we got the high-tension wires crossed up, which blowed the fuse in Fruitport or some place, and stopped all the cars on the line for a period, I should judge, of 20 minutes. He spoke up and said, 'Then you know by instinct.' I said, 'Naturally,' or something to that effect. That is all there was said. *  *  * There was an insulator broken up on the middle wire on the south side of the pole on the second arm from the top. *  *  * Jim went on up the pole; I did not pay much more attention to him.

*  *  *  No; I could not state how long he was up the pole doing that work. Yes; he had his spurs on when he started up the pole. He could not have got up the pole if he did not have his spurs on.  *  *  * He put this insulator on, and tied the wire back into its place. That work was a part of his duties as a lineman. I asked him how the cross-arm was, and he says, 'Apparently good, except split a little at the end.' He said he would tie it over to the pole with a piece of wire so it would be all right. I think I stood around for a few moments, and the next thing I heard him say, 'I guess I got my foot caught.' I asked him if he wanted any help, and he says, 'No.' Mr. Winterstein spoke up and said something about taking it out the same way you put it in. Just then I started across the road to this guy stub, where this guy runs across the highway. I was going over there to inspect the anchor and see if some of the wires were broken in the anchor, the part that runs from the pole down to the guy, the anchor guy. When I got over there and looked at it and started back, I did not pay any more attention to him. Just as I got—there is a lot of dirt down to the bank, where they graded the road, to make it higher at that point; I was just across there, if my memory serves me correctly. I heard him say, 'I got mine;' and just then I heard a crack, and I jumped for the wagon and got my spurs, and I ran over to the pole, and was going to put one spur on my foot, and I looked up, and he had started to fall then, so I saw there was no use of going up, and I started around to the street car bridge. I thought maybe I might be able to catch him and break the fall; but before I got there he had struck on the interurban bridge, and his chest struck across the north rail of the interurban railway. It was his left foot that was caught. He had it in between the braces under the second cross-arm.

"*Q.* What did he have his foot in there for?

"*A.* To hold himself in position to do his work.

"*Q.* As you said you heard some noise there, what was that noise, if you know, Mr. Short?

"*A.* It was electricity.  *  *  *  I have worked around in connection with lines charged with electricity ever since I have been working at telephone work, which is 13 years ago last April. I am familiar with

the sound produced by the passing of electricity across gaps or in making circuits. That is what I base my answer on when I say it was electricity. When I last saw Jim on the telephone pole before I heard this sound, which, I say, was electricity, he had his foot in between these braces, and was taking his spur off to get his foot out, his left foot. He was then facing the pole, facing the east. He had his left foot in between the braces under the cross-arm, and the other spur was in the pole holding his weight down below the braces, and he was hanging on the second cross-arm with one hand, and taking his spur off with the other hand. * * * The last time I saw Jim before I heard that passing of electricity his shoulders would be nearly even with the top cross-arm; his head would be looking down to his feet, where he was taking his spur off. His head would be even with the top cross-arm. His body would be just below the top cross-arm, and directly west of the telephone pole. There might have been a minute and a half or two minutes elapsed between the time I last saw him up there when he was getting his foot out of that cross-arm before I heard that crash of electricity."

The teamster's version does not differ materially from that of the foreman. We quote:

"I stopped the team, and as they stopped he went to work up the pole to put the glass on. After he got the glass on, he said, 'I guess I have got my foot caught here.' I says, 'Maybe you can take it out the same as you put it in;' and Mr. Short spoke up and says, 'Maybe, if you take your spur off, you can take your foot out all right;' and while he was taking off his spur I was looking up at him while he was taking off his spur. He got it pretty well off, and my horses started to start up, and I turned around and stopped them, and as I looked back I saw Mr. Teachout throw up his hands and make a groan, and it looked to me as though there were two balls of fire leaving his body, perhaps as big around as, well, a person's hat, a common hat, passed from his body, and at that he fell on the wires below him and dangled there a little, and from there to the railroad track, on the railroad. * * * Jim was on the west side of the telephone pole. I think he put his left foot through these braces that

was on the lower cross-arm, between the brace and the cross-arm and the pole. I would not be able to state how far he put his foot through there. He was doing the repair work on the lower cross-arm, towards the bridge, I think. I should not think he was up that telephone pole over 15 minutes. I did not time him. It might have been less than that. I know he put this glass on, on the pin, and I know he tied a wire around the arm, and tied the wire fast to this glass, wound a wire around the arm, and he tied the wire around the glass, and fastened the wires, as they usually did on these glasses, and I think he put a wire around the cross-arm besides that. I was looking up at him most of the time. The last time I saw him before I heard the groan and saw these balls of fire he wasn't standing quite straight up. I think his position would be—I think he was getting his foot out of the brace. I think his shoulders were up even with the top cross-arm, and his head would be a little higher, of course. * * * I was looking at the pole, and· as the horses started I turned and stopped them. At that time Jim's face was towards the pole. This was when he was getting his foot out of the brace, when he was standing with his face towards the pole, and about the time I looked up he made this groan, and almost at the same time was when I seen this discharge from his body, what I supposed to be fire, and at that he fell and struck on these wires, and from there to the ground, to the railroad. As ·to how long a period elapsed between the time I looked up when I say his shoulders were about even with the top cross-arm, and he was getting his foot out, and then I turned around and checked my horses, and then turned around again and heard him groan, and saw the flash, that would be a very short time. You can imagine just—it would be like that [indicating]. A person can tell better by that than I can; just stopped my horses and looked right back again. When I was looking up when he was getting his foot out of the brace I was on the wagon facing the east; the pole would be to the right of me, and a little west. I just set there on the wagon and looked right up at him. My horses started up maybe one step. I would not be able to fix the time between these two times I looked up, a very short time; but I couldn't

say how long a time' it was.  His body when I looked up the last time was pretty near straight up, with his hands up and out, and apparently falling.  His shoulders, just at that very instant, I should think would be a little above the top cross-arm.  I think the groan and his hands going up came before the fire.  It wasn't an instant between the whole three of them; I don't think any more than that [snapping his fingers].  The groan I think was about like that [witness groans].  I heard it very plain.  It might have been a little louder than the groan I have made here.  The balls of fire seemingly went right from the body, each way from it."

1. Were the jury justified in finding defendants were negligent?  It appears beyond question that the telephone lines had been in use several years before the high-tension lines were strung.  It goes without saying that employees of the telephone company must climb the poles to keep the lines in repair, which repairs from time to time are necessary if the line is to do business.  These repairs cannot be made without some portion of the employee being above the cross-arms where the wires are strung.  It is also clear that, if an employee came in contact with a high-tension line carrying several thousand volts of electricity, great harm is sure to come to the employee.  This court will not say a jury is not justified in finding that to string such tension wires so close to telephones wires as was done here was negligence.  See Joyce on Electric Law (2d Ed.), §§ 445, 517a; *Mitchell* v. *Electric Co.*, 129 N. C. 166 (39 S. E. 801, 55 L. R. A. 398, 85 Am. St. Rep. 735) ; *Potts* v. *Railway Co.*, 110 La. 1 (34 South. 103, 98 Am. St. Rep. 452) ; *Giraudi* v. *Improvement Co.*, 107 Cal. 120 (40 Pac. 108, 28 L. R. A. 596, 48 Am. St. Rep. 114) ; *Denver, etc., Electric Co.* v. *Simpson*, 21 Colo. 371 (41 Pac. 499, 31 L. R. A. 566 and note, page 568) ; *Berry* v. *Telegraph Co.*, 95 Miss. 729 (50 South. 69) ; *Thomas* v. *Gas Co.*, 108 Ky. 224 (56 S. W. 153, 53

L. R. A. 147) ; *Mize* v. *Telephone Co.*, 38 Mont. 521 (100 Pac. 971, 129 Am. St. Rep. 659, 16 Am. & Eng. Ann. Cas. 1189) ; *Kile* v. *Power Co.*, 149 Mo. App. 354 (130 S. W. 89) ; *Kraatz* v. *Light Co.*, 82 Mich. 457 (46 N. W. 787) ; *Warren* v. *Railway Co.*, 141 Mich. 298 (104 N. W. 613) ; *Johnson* v. *Bay City*, 164 Mich. 251 (129 N. W. 29, Ann. Cas. 1912B, 866) ; *Huber* v. *Electric Co.*, 168 Mich. 531 (134 N. W. 980).

2. Was the decedent guilty of contributory negligence as a matter of law? In *Brezee* v. *Powers*, 80 Mich. 172 (45 N. W. 130), it is said:

"Questions of negligence are usually for the jury to determine, under all the circumstances; and to warrant the court in determining, as a matter of law, that these facts and circumstances show contributory negligence, they must be so conclusive that reasonable and prudent men would not disagree. If from the facts and circumstances the negligence is manifest, then, as I have before stated, it is a matter to be disposed of by the court as a matter of law. Where the essential fact in a case is whether contributory negligence did or did not exist, and this depends upon inferences to be drawn from facts and circumstances about which honest, intelligent, and impartial men might differ, such a case should be submitted to the jury. *Swoboda* v. *Ward*, 40 Mich. 424; *Conely* v. *McDonald*, 40 Mich. 150; *Railway Co.* v. *Slattery*, 39 Law T. (N. S.) 365."

See *Ashman* v. *Railroad Co.*, 90 Mich. 567 (51 N. W. 645) ; *Becker* v. *Railway Co.*, 121 Mich. 580 (80 N. W. 581) ; *Haxer* v. *Griessel*, 162 Mich. 310 (127 N. W. 309).

In 15 Cyc. p. 475, it is said:

"As in other cases of negligence, contributory negligence on the part of plaintiff, in an action for injury done by electricity, precludes a recovery. Thus one who has notice of the dangerous condition of a wire or other electrical appliance, and voluntarily brings himself into contact with it, cannot hold the company for the resulting injuries. To give rise to this de-

fense, however, it must be shown that plaintiff, in coming in contact with the appliances, voluntarily and unnecessarily exposed himself to danger, and if reasonable men might honestly differ on the question, the court will not hold plaintiff guilty of contributory negligence as a matter of law."

Defendants could hardly contend that because of their conduct the telephone company must abandon its pole, and, if it was not to be abandoned, it must be held that its wires must receive attention, making it necessary for its employees to go upon the cross-arms. In *Potts* v. *Railway Co.*, 110 La. 1 (34 South. 103, 98 Am. St. Rep. 452), it is said:

"The fact that he knew there was, at that point, leakage from the trolley wire to the span wire, and yet continued working there, was not of itself negligence barring recovery. Beach on Contributory Negligence (2d Ed.), pp. 44 and 50.

"He could still work there notwithstanding knowledge of the hot span wire, and would not be chargeable with negligence, unless he failed to take due precaution and exercise due care to shield himself from harm.

"This is not a case of a master furnishing defective appliances to do his work and which the servant, knowing the defect and danger, proceeded, notwithstanding, to do the work, thus assuming the risk. Potts was not the servant of the car company, and it was the latter's span wire that did the mischief.

"In *Clements* v. *Light Co.*, 44 La. Ann. 692 (11 South. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348), this court held that when a person is employed in the presence of a known danger, to constitute contributory negligence it must be shown that he voluntarily and unnecessarily exposed himself to the danger.

"It is not contributory negligence to engage in a dangerous occupation. Such was the ruling of this court in *Myhan* v. *Power Co.*, 41 La. Ann. 969 (6 South. 799, 7 L. R. A. 172, 17 Am. St. Rep. 436). See, also, Beach on Con. Neg. 370; Wood, 763.

"It did not appear to the satisfaction of the jury that Potts had unnecessarily exposed himself to the

existing danger in executing the work he was called on by his employers, the telephone company, to do. It did not appear to them that he had failed to take due precaution to shield himself from danger. In this we are not prepared to say the jury erred."

*Balderson* v. *Telephone Co.,* 173 Mich. 412 (139 N. W. 7).

We think the question of contributory negligence was for the jury.

3. Did the court err in its charge as to the presumption that decedent was in the exercise of due care? In *Teipel* v. *Hilsendegen,* 44 Mich. 461 (7 N. W. 82), Justice COOLEY, speaking for the court, said:

"When one sues to recover damages for a negligent injury, the gravamen of his complaint is that he has been damnified by the wrongful and negligent action of the defendant without having contributed thereto by negligent conduct of his own. The absence of contributory negligence is therefore a part of his case, and it is quite proper to say that he should show that he acted with due care. *Le Baron* v. *Joslin,* 41 Mich. 313 [2 N. W. 36]. But this only requires of him that he should put in evidence the facts and circumstances attending the injury, and if these show negligent conduct in the defendant from which the injury followed as a direct and proximate consequence, and do not show any contributory negligence in the plaintiff, a *prima facie* case for a jury is made out. He cannot be required to go further than this in negativing his own fault, and in many cases where there are no eyewitnesses it would be impossible.

"Nor is it necessary that the absence of contributory negligence should be shown beyond cavil or question. If the circumstances are such that reasonable minds might draw different conclusions respecting the plaintiff's fault, he is entitled to go to the jury upon the facts. The judge takes the case from the jury only when it is susceptible of but one just opinion.

"In this case there were no eyewitnesses, and the injury resulted in death. The plaintiff sues as administrator of the person killed. There was some

evidence of negligence on the part of the defendant, and there was some ground for an opinion that the intestate was negligent also. But the plaintiff put in such proofs of the attendant facts as were attainable under the circumstances, and from these it was by no means clear that the intestate was in fault at all. There was room for the conclusion that he was not. We think the case ought to have gone to the jury."

In *Adams* v. *Iron Cliffs Co.*, 78 Mich. 271 (44 N. W. 270, 18 Am. St. Rep. 441), Justice MORSE, in speaking for the court, said:

"This brings up squarely the question of contributory negligence in a case where there is no eyewitness of the accident. In such a case, while the rule is not relaxed that the plaintiff must show that his intestate was without fault, yet the presumption, in the absence of any evidence to the contrary, obtains that the deceased used ordinary care and caution in attempting the crossing, and such presumption is sufficient under the rule to permit the plaintiff to recover upon showing negligence in the defendant. *McWilliams* v. *Mills Co.*, 31 Mich. 274; *Mynning* v. *Railroad Co.*, 59 Mich. 257 (26 N. W. 514); *Id.*, 64 Mich. 102 (31 N. W. 147 [8 Am. St. Rep. 804]); *Id.*, 67 Mich. 680 (35 N. W. 811); *Kwiotkowski* v. *Railway Co.*, 70 Mich. 549 (38 N. W. 463); *Railway Co.* v. *Clark*, 108 Ill. 113; *Teipel* v. *Hilsendegen*, 44 Mich. 462 (7 N. W. 82)."

See *Van Doorn* v. *Heap*, 160 Mich. 199 (125 N. W. 11); *Richardson* v. *Railway Co.*, 176 Mich. 413 (142 N. W. 369).

The reason for this rule of law is that life is dear to the normal person, and that he will not willingly do the thing which will extinguish it, but, on the contrary, will exercise due care to preserve it. In this case it was shown that Mr. Teachout was a healthy, robust man, 24 years of age. He was skillful in his work, and his associates say he was a careful, prudent man. Neither the foreman nor the other man saw anything in his conduct calling for criticism. Just at the time when the thing happened which resulted in

his death both of them had their attention directed away from him so that they did not see what happened. The agency which caused the mischief was a silent one of such deadly character that its work was done so quickly that the time was hardly appreciable. We think the rule stated by the trial judge was the correct one.

4. Did the decedent assume the risk? There has been much confusion in the use of the terms "contributory negligence" and "assumed risk." They are often used as though they meant the same thing, which is not a fact. In *Bauer* v. *Foundry Co.*, 132 Mich. 537 (94 N. W. 9), it is said the doctrine of assumed risk rests upon the theory of a contract, citing *Narramore* v. *Railway Co.*, 96 Fed. 298, 37 C. C. A. 499 (48 L. R. A. 68). In *Bradburn* v. *Railroad Co.*, 134 Mich. 575 (96 N. W. 929), Justice CARPENTER, speaking for the court, said:

"The principle of assumed risk rests upon the ground that it is an implied contract between the employer and the employee that the employee shall assume the risk of all dangers obviously incident to his employment. See *Bauer* v. *Foundry Co.*, 132 Mich. 537 (94 N. W. 9). The employee assumes the risk of all dangers obviously incident to his employment, whether the employer is negligent or free from negligence in exposing him to those dangers."

Clearly no contract relations existed between the deceased and either of the defendants, nor did the relation of employee and employer exist between them.

5. Is the Grand Rapids-Muskegon Power Company relieved from liability? This defense is based upon the claim that it was selling the electricity under a contract providing for its delivery at a point reached before the place of the accident, thereby making the current the property of the interurban road, and that such contract in terms provided the power company

should not assume any responsibility for the transmission line. We quote from the brief of the interurban company:

"On June 2, 1911, at the time of this accident, the machines at Walker were running, and cars were in operation east of Coopersville; in fact one was approaching the high bridge at that time. Electricity that had not reached the transformers and meter, and hence was still the property of the power company, was then passing over the entire transmission line from Walker to Fruitport. This transmission line carried an alternating current to a great number, probably 100 customers of the power company, a portion of which current or energy was taken off, converted into direct current by the railway company's transformers or rotary converters at the substations of Walker, Coopersville, and Fruitport, and was then metered by watt meters; the railway paying for the current there taken and delivered. Other portions of this alternating current carried by the same transmission line was taken off, transferred, and metered presumably in the same way by the town of Coopersville and other patrons of the power company there. On the day and at the hour of the accident the power company was feeding current into the transmission line at both ends, and this was being done regularly as the record shows, in emergency."

This statement seems to be warranted by the record.

In *Thomas* v. *Gas Co.*, 108 Ky. 224 (56 S. W. 153, 53 L. R. A. 147), a like defense to the one interposed here was urged. In disposing of the case, the court said:

"The street railway company owned and had charge of the wire, and the gas company generated and sent in to the wire the electricity. The gas company received so much per month for supplying the wires of the street railway company with electricity to operate its line of street cars, and it had no interest in the car line, except that its income might enable it to pay the bill for the electricity. That there was a duty

imposed by law upon the street railway company to keep its wires properly insulated, so that those whose business or pleasure brought them in dangerous proximity to them might be protected from the deadly current which they conducted, cannot be questioned. Without the electric current which the gas company sent through them, contact with them was harmless. When so charged, they became instruments of death, threatening the lives of those who, perchance, came in contact with them. Did the fact that the gas company supplied the harmless wires with the force which converted them into a death-dealing agency make it responsible for the injury which resulted in the death of the intestate? The exact question submitted has not, so far as we are aware, been answered by any court of last resort. Some cases are cited by counsel; but the facts of those cases are not similar to the facts of this case. Therefore we must find some signboard along the new road, and, if we cannot so find the way to a proper conclusion, we will be forced to swing a sickle into the field of reason, and there harvest a principle which can be crystallized into a just rule to apply to cases like this one. By the machinery in use by the gas company, it produced and controlled the electricity. It is presumed to, and did, know the dangerous force it was putting in motion, and that it constantly imperiled the lives of those who passed along the streets where the wires were in use, unless they were properly swung and insulated. Knowing the dangerous character of the force it supplied, it was bound to use the care commensurate with the danger of its employment, so as to protect those who passed along the streets or places where the wires were placed. * * * Considering the dangerous character of the force produced by the gas company, there was a duty imposed on each to see that the wires into which it was sent were properly insulated. The danger was exactly the same whether the wires were owned by one or both of the companies. When one through the instrumentality of machinery can accumulate or produce such a deadly force as electricity, he should be compelled to know that the means of its distribution are in such condition that those whose business or pleasure may bring them in contact with it may do so with safety.

"It is argued on behalf of the gas company that a manufacturer of electricity, who delivers it to another, and thus parts company with it,—its dangerous character not being concealed, and such other person being competent to look after and control it,—does not owe any duty to any one.   *   *   *   One must use his own property so as not to do injury to another. The use of the wires would have been harmless, except for the current of electricity; and that current was sent into the wires by the appellee, producing the death of plaintiff's intestate.   Then it was the use of the force (its property) it generated which produced the injury.   If the wires were not properly insulated, and the death resulted therefrom, then both companies are liable, as it was the duty of the street railway company to have its wires properly insulated, and there was a duty resting on the gas company to see that it was done, before charging them with electricity."

It is not necessary to go as far as this in the instant case, as the power company was using the line to transmit electricity which it was selling to other customers than the railroad company.   We think the principles stated in the recent case of *Sykes* v. *Village of Portland,* 177 Mich. 290 (143 N. W. 326), are applicable here.   It is not necessary to restate what is there said.

We have examined the other assignments of error, but do not think it necessary to discuss them.

The judgment is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.