# Kentucky Utilities Company v. Sutton's Administrator.

(Decided March 6, 1931.)

GORDON & LAURENT and TYE, SILER, GILLIS & SILER for appellant.

B. B. SNYDER, J. B. SNYDER, CHARLES UPTON and JAMES M. GILBERT for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

The Williamsburg High School was built by the school authorities in the year 1927; the electric wiring in the building being installed by C. L. Hagaman of Harlan, Ky., doing business under the name of Hagaman Electric Company, as subcontractor of the general contractor, O. T. Black. The building has a gymnasium about 90 feet long and 80 feet wide. There is a balcony on either side of this gymnasium supported by iron rods running from the front of the balcony up to steel crossbeams. There are four of these crossbeams extending from one side of the gymnasium to the other at a height of from 20 to 22 feet above the floor. On the top side of these beams are braces constructed very much like bridge work. The gymnasium is lighted by twelve droplights, three of which hang from each beam. Each light has a metal reflector. These twelve lights are divided among three electric circuits; there being four lights to each circuit. The middle row of four lights is the one involved in this suit. The three electric circuits are controlled by three switches on a plate located on the wall of the balcony. The center switch controls the middle row of lights. About 9:30 on the morning of January 18, 1929, appellee's decedent, Clarence Sutton, who had been playing basket ball in the gymnasium, and who was wet with sweat, climbed up on one of the crossbeams to replace a globe in one of the lights of the middle row which had burned out. None of the lights in the gymnasium was burning at this time. When Sutton reached the light with the burned-out globe, he sat down straddle of the beam, leaned over until his stomach and chest rested against one of the steel braces, and then reached down and got

hold of the light cord and pulled it up until he got the reflector in his hands. Holding the reflector with his right hand, he unscrewed the burned-out globe with his left. He reached around to hand the globe to Clifford Freeman, a school companion who was upon the beam behind him, and, while he was in the midst of that act, he collapsed and dropped the reflector. Within two or three minutes he was dead, having been, as is conceded, electrocuted. While Sutton was holding the reflector, and just as he dropped it, the three other lights on the middle row momentarily lighted up, but went out as soon as Sutton dropped the reflector. Those lights were not burned out, and neither was a light in the basement, which was burning at this time whilst the janitor was doing some work, and which was also on the same circuit as was the middle row of lights in the gymnasium. The appellee, as the administrator of the estate of Clarence Sutton, brought this suit against the appellant, who supplied electric current to the schoolhouse, to recover for the death of his decedent.

The original petition charged that Sutton "was killed by a current of electricity which was negligently sent into said building and gymnasium by the defendant . . . and which . . . was allowed by the negligence of the defendant . . . to come in contact with the body and person of the said Clarence Sutton, whereby he was instantly killed by the same." The amended petition charged that Sutton "was killed by a current of electricity which came in contact with his body which said current of electricity was owned and maintained and operated by the defendant . . . and that the gross carelessness and negligence of the defendant . . . in the operation and maintenance of said electricity wholly caused the death of plaintiff's intestate." The answer traversed the allegations of the petition with a plea of contributory negligence, which was in turn denied, and on these issues and the evidence heard in support thereof the case went to the jury, which found a verdict in behalf of the appellee in the sum of $7,000. From the judgment entered on that verdict, this appeal is prosecuted.

Appellant by its brief expressly waives all errors relied upon in its motion and grounds for a new trial, except its claimed right to a peremptory instruction, and

that question is the only one we have for determination on this appeal. There can be no escape from the dilemma that Clarence Sutton met his death either through some defect in the light socket which he was holding in his hand at the time he was killed or because of some excess of voltage of electricity sent into the building by the appellant and the effect of which the light socket was not designed to, and did not, prevent. To answer the natural inquiry as to how there was any current of electricity present at the socket when the switch on the wall of the balcony which was supposed to control the electricity to this middle row of lights was thrown, it may be said that these lights were controlled by two wires, one of which led directly to the lights from the panel board and the other of which went through the switch to the lights. The electric wire which carries the electricity is called in this record by all the witnesses "the hot wire," and the other wire which completes the circuit by returning the current to the ground, and which is the neutral wire, is called by these witnesses "the cold wire," and we shall adopt their terminology. In proper construction, the hot wire should have gone through the switch and the cold wire should have been the one which led directly to the lights, but through some error in construction the hot wire on this circuit upon which the middle row of lights was strung led directly to the lights and the cold wire went through the switch. Therefore, when the switch was thrown, although potentially the current was present at the sockets of these lights, yet, because the circuit was broken, the lights did not light up, but, when the circuit in any manner became grounded, as it was when the socket or reflector came in contact with the sweaty body of Sutton, which was prone upon the steel beam, which in turn was grounded, the circuit was completed and the current flowed.

Returning now to the possible causes of Sutton's death, and taking the second alternative first, we find that every witness in this case, those for the appellee as well as those for the appellant, testified that, if any excessive voltage had been sent in over the wires after Sutton had grounded the circuit and thus closed it, all the lights on that circuit would have burned out, and especially so would the light in the basement. For instance, C. L. Hagaman, who installed this electric work

in the building, and who testified for the appellee herein, was asked this question:

"If that lamp (the cellar light) was on that same circuit . . . on which the boy was killed continued to burn . . . after the accident, would you say or not that the boy was killed from excessive voltage? A. If the light was burning at the time he was killed, no."

The expert witnesses for the appellant, including Professor W. E. Freeman of the University of Kentucky, corroborate Mr. Hagaman in this statement, and there is no evidence in the record to the contrary. Further, all of the testimony bearing on this point, and especially that of Hagaman, is to the effect that, had there been any excessive voltage, the socket which Sutton was holding when he was electrocuted would have been ruined, and Hagaman testified that, examining it some time after the accident, he found it to be in good shape. All the witnesses agree that this socket was built and designed to withstand and guard against a voltage of at least up to 250 volts, the ordinary voltage on this circuit being 110 volts, with a permissible variance from 104 to 125 volts. All the witnesses who testified on the point agree that the cellar light was not burned out, nor were the other lights on the middle row burned out. The conclusion is therefore inescapable that Sutton did not meet his death through any excessive voltage coming into the building. This conclusion eliminates the necessity of discussing the evidence as to the equipment of appellant outside the building, for, even if it be conceded, in the face of the overwhelming evidence to the contrary, that there was any defect in the transformer on the pole in the street because of lack of ground there or otherwise, such defect did not cause the death of Sutton, for, as we have seen, that death was not caused by any excessive voltage on the wire, and the defect, if any, would have had no effect except to send into the building an excessive voltage.

There is left only the other alternative cause of Sutton's death; that is, some defect in the socket. As to this, the appellant contends that it is not responsible for any such defect, as it did not install, control, maintain repair, or operate the electric installation in this high school building. Appellee responds to this that the high

school building was a place where the public congregates, and where it should have been expected to congregate, and, that being true, under the opinion of this court in the case of Thomas, Adm'r, v. Maysville Gas Co., 108 Ky. 224, 56 S. W. 153, 21 Ky. Law Rep. 1690, 53 L. R. A. 147, the appellant was responsible for sending any current over defective wires and fixtures, although such defective wires and fixtures were owned by another; secondly, that appellant knew, or was charged with notice of a defect in this wiring system and fixtures, and, if it thereafter sent its electricity over such a defective wiring system and fixtures, it is responsible for accidents resulting therefrom; and, thirdly, that the appellant having, as it did, used a ground in the building to ground the neutral wire on the three-phase system that carried the current from the transformer on the pole in the street to the panel board in the building, the appellant had adopted the whole wiring system and fixtures in the building. Appellant relies on the case of Smith's Adm'x v. Middlesboro Electric Co., 164 Ky. 46, 174 S. W. 773, 780 Ann. Cas. 1917A, 1164, and contends that it did not by using the ground installed by the school board in the building take over the entire electric wiring system and fixtures of the high school.

In the Maysville case the facts were these: The Maysville Gas Company generated and sold electric power to the street car company of that town. One of the wires of the street car company which was hung in and along a public street became defective, broke, and fell, and a pedestrian, coming in contact with it, was killed. His administrator sued both the street car company and the gas company, and recovered a verdict against both companies. The street car company did not appeal, but the gas company did. This court held the gas company liable on the theory that, knowing the dangerous character of the force it supplied, the gas company was bound to use the care commensurate with the danger of its employment so as to protect those who passed along the streets and might come in contact with the wires, although they were owned and controlled by other parties, because, when one through the instrumentality of machinery accumulates or produces such a deadly force as electricity, he should be compelled to know that the means of its distribution are in such condition that those whose business or pleasure may bring them in contact with it may do so with safety. Appellant argues that

this case is unsound and should be overruled, but we do not regard it as necessary to inquire into its soundness in this case, because we do not believe the facts of this case bring it within the doctrine of the Thomas case.

In the Smith case, a druggist, in handling an electric light attached to the wiring system in the drug store, was, because of some defect in such system, electrocuted. In holding the electric company that supplied the electric current not responsible we said:

> "The just rule seems to be that the electric light company should not be responsible for injuries received by persons arising solely from the defects in the wiring and appliances used for electric lighting purposes within their own houses, and which are owned by them, and over which they have entire control, and where the only connection between the company and the person using the lights is a contract between them and the company for the company to connect its system with the inside wiring of such parties and to deliver a current for their use, in the absence of knowledge on the part of the company of the defective condition of the wiring and appliances of such parties."

There is no conflict between the Smith case and the Thomas case, and the principle to be deduced from them, considered together, is that there is no duty to inspect a wiring system over which the current of a power company flows, where the company has not the unfettered right of access for the purpose of inspection at all times, and, if there is no duty to inspect, no liability results from a defect in such wiring system, unless the company, with knowledge of such defect, continues to send its current over such wiring system. In the Smith case, the electric company could have inspected the inside wiring and fixtures of the drug store only when permitted to do so by the owner of that store, and, in the instant case, the appellant could have inspected the inside wiring and fixtures of the high school only and when and as permitted to do so by the trustees of the high school. It follows then that under our authorities there was no duty on the part of the appellant to inspect, and there was no liability on its part for any defect in the wiring system and fixtures of the school, unless it knew of such

defect, and with such knowledge continued to send its current over such system, or unless perhaps, as appellee contends, it had adopted and taken over such system, a question we shall presently discuss. The doctrine of the Smith case rather than the doctrine of the Thomas case is the applicable one. Appellee contends, though, that the principle of the Thomas case should rest solely on whether the public is likely to be brought in contact with the defective wire, the right of access to inspect, although present in that case, being immaterial, and in support of that contention cites the following cases in which he says the doctrine of the Thomas case has been so rested:

The first case is that of Lewis' Adm'r v. Bowling Green Gaslight Co., 135 Ky. 611, 117 S. W. 278, 22 L. R. A. (N. S.) 1169. That case was like the Thomas case. The defective wire was located on a public highway, and the pedestrian killed was walking along the highway.

The foreign cases so relied upon by appellee clearly do not establish such doctrine as a statement of their facts will demonstrate. In the case of Arkansas Power & Light Company v. Cates, 180 Ark. 1003, 24 S. W. (2d) 846, 850, the facts were that the power company by its franchise was required to insulate its wires. It failed to insulate a wire running along a public street, and, while Cates was putting up an electric sign in front of a building he occupied, a wire he was holding came in contact with the uninsulated wire, and he was hurt.

In the case of Blackburn v. Southwest Missouri R. Co., 180 Mo. App. 548, 167 S. W. 457 (Springfield, Mo., Court of Appeals), a school building had paid for the erection of some poles and wires along a public street to carry current to the school house. The power company retained the management, control, and repair of these poles and wires. While a house was being moved along the street, it came in contact with these wires which were not insulated, resulting in injury to one of those helping to move the house.

In Fish v. Kirlin-Gray Electric Co., 18 S. D. 122, 99 N. W. 1092, 1093, 112 Am. St. Rep. 782, the electric company sold a church an arc light, and agreed to maintain it and keep it in repair. It failed to do so, and the light fell, hitting and injuring a worshipper.

In Teachout v. Grand Rapids, G. H. & M. R. Co., 179 Mich. 388, 146 N. W. 241, a power company supplied

electric power to interurban company, but the line which supplied the power to the interurban company was also used by the power company to supply other customers it was serving. The power from this wire came in contact with an employee of the telephone company that was repairing the telephone wires and he was injured.

The court in this Michigan case specifically said that it did not have to go as far as the Thomas case.

In the case of Hoboken Land & Improvement Co. v. United Electric Co. of New Jersey, 71 N. J. Law, 430, 58 A. 1082, a saloon caught fire from a meter which it was the duty of the electric company to install, and the construction of which the company had intrusted to an independent contractor. The court held that, the meter being part of the electric company's equipment, it could not escape liability for its defective installation because of having had it done by an independent contractor.

In the case of San Juan Light & Transit Co. v. Requena, 224 U. S. 89, 32 S. Ct. 399, 56 L. Ed. 680, there was simply the sending in to a private residence of an excessive voltage.

In the case of Hebert v. Hudson River Electric Co., 136 App. Div. 107, 120 N. Y. S. 672, the facts are very meagerly stated, but the best that can be gotten out of them is that the person injured was hurt by the current from a wire running from the Hudson River Electric Company to another power company; such wire at the place of injury still being under the control of the Hudson River Electric Company.

This short summary of these foreign cases demonstrates that their facts either bring them within the facts of the Thomas case or show their entire lack of applicability to the questions raised in this case and that these cases do not support the contention of the appellee as to the test upon which the principle of the Thomas case is to be applied. If appellee were correct in that contention, power companies would be responsible for defects in the wiring system of churches, theaters, foyers of office buildings, hotels, railroad stations, bus stations, clubs, lodge halls, and a host of other places where the public congregates, despite the fact that the power company, without the permission of the owners of these places, would have no right of access for the purpose of inspection. Such a rule would put such a burden upon

the power companies as would tend to put them out of business or to impose upon the consumers of their power greatly increased rates. The injured party has his remedy against him who has control of the building. If fortuitously that one having control be a public agency, and the building be one used in governmental service, such as a courthouse or, as here, a school building, that cannot change the rule. True it is, the injured party cannot recover, but he is in just the same situation as any one who is injured by an arm of the government discharging a governmental function. Because of reasons not necessary to discuss here, the burden of bearing the loss is put upon the injured party in such state of case rather than upon the public generally. But, because he cannot put the burden of his loss upon the public, the injured party should not be permitted to shift it to the power company who is as innocent of the cause of the defect as he is.

But, though all this be so, appellee contends that appellant was put on notice of some defect in the wiring or fixtures of this high school building if such there was because of the size of the bills for service which the appellant sent to the school board. It appears that for the month of October, 1928, the bill for service was $2.47; that for November $12.48; that for December, $20.67; that for January, 1929, $21.19; that for February, $26.74; whereas that for March was $9.23, and that for April, $2.60. Appellee says that these large bills for December, January, and February, as compared with the smaller bills of the previous months and the smaller bills of the succeeding months, indicate that there was a leakage of current during the months of these big bills, and this should have put the appellant on notice that something was wrong. On the other hand, the appellant has produced the bills of the school board from March, 1927, to December, 1929. They show that, beginning with the spring month of April of each year, the bills for the high school began to decline during the summer months, amounting to nothing at all or only a nominal amount, and that in November they began to climb again. The bills for December, January, and February of the year prior to the year of the accident were just about as high as those of the year of the accident, whereas the bills for the months preceding and succeeding those months of the year preceding the accident were about as small as

the months preceding and succeeding the high months of the year of the accident. As the months of December, January, and February are the gloomy and dark months of the winter, and the months when the gymnasium was much in use at night for basket ball exhibitions, it is apparent that there was nothing in these bills alone to excite the attention of the appellant or to put it upon any notice of any defect in the wiring system or fixtures. As appellee relied only upon these bills to charge the appellant with notice, it follows that he failed to show that appellant had any knowledge of any defect in the wiring system or fixtures when it sent its current into the high school building.

Lastly, appellee contends that, by using the ground installed in the school building by Hagaman as a part of the wiring system of the school for its neutral wire on its three-phase system that brought the current from the transformer on the pole in the street into the school building, the appellant adopted the whole interior wiring system of the high school. To this we cannot agree. This ground was just inside the building, and, by connecting with it, appellant did not affect the condition of the wiring system elsewhere in the building. Whether appellant would be responsible for any defect in this ground or not does not concern us here, for this ground, its construction and maintenance, had, so far as this record shows, nothing to do with this accident. Appellant by connecting with it perhaps made it a part of its system, but to that extent only. Such connection did not cast upon the appellant the adoption of the whole interior wiring system of this large building.

What we have said being true, it follows that the appellant is correct in its contention that it was entitled to a peremptory instruction. The argument of the appellee that it was entitled to go to the jury under the principles of the doctrine res ipsa loquitur cannot prevail, for, as we have seen, the evidence established without cavil that Sutton was not killed because of any excessive voltage sent in over the wires, and, this being true, the res ipsa loquitur doctrine has no application, since the place where the fixture by which Sutton was killed was not under the control or management of the appellant—a condition necessary to the application of the doctrine contended for.

The judgment of the lower court is therefore reversed, with instructions to grant the appellant a new trial in conformity with this opinion.